UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

FORMAN HOLT & ELIADES LLC
218 Route 17 North
Rochelle Park, NJ 07662
(201) 845-1000
Attorneys for Charles M. Forman, Chapter 7 Trustee
Harry M. Gutfleish (HMG-6483)

In Re:

NJ AFFORDABLE HOMES CORP.,

               Debtor.

Chapter 7
Case No: 05-60442 (RG)

Hearing Date: May 31, 2006
               10:00 a.m.

**TRUSTEE'S RESPONSE TO OBJECTIONS FILED BY ALAN BAUERLE**

Charles M. Forman, the duly appointed chapter 7 trustee (the "Trustee") for NJ Affordable Homes Corp. (the "Debtor"), through his attorneys, Forman Holt & Eliades LLC, submits this response to the objections filed by Alan Bauerle to the Trustee's motion for authorization (A) to retain a joint venture comprised of DJM Asset Management, LLC ("DJM") and Sheldon Good & Company Auctions NorthEast, LLC to market and sell real properties pursuant to 11 U.S.C. §§ 327(a) and 328(a), (B) to sell real properties free and clear of all liens, claims and interests at one or more auction sales discussed below pursuant to 11 U.S.C. §§ 363 and 105, and (C) to borrow up to $500,000.00 from DJM and to provide first priority priming liens to DJM pursuant to 11 U.S.C. §§ 364 and 105 (the "Motion").

**A.**    **Introduction**

1.    On November 22, 2005 (the "Petition Date"), Nicholas H. Politan, the court-appointed receiver for the Debtor, filed a voluntary petition on the Debtor's behalf for relief

under chapter 7 of the United States Bankruptcy Code, 11 U.S.C. §101 *et seq*. (the "Bankruptcy Code").

2. On November 23, 2005, the Trustee was appointed to serve as the chapter 7 trustee for the Debtor's bankruptcy estate.

3. By offering 15% to 20% compounded interest on funds invested, the Debtor, Wayne Puff ("Puff") and their cohorts defrauded hundreds of people out of tens of millions of dollars.

4. As part of this their scheme, the Debtor and Puff intentionally relied on misleading property appraisals to: (a) induce investors to invest funds in return for mortgages that far exceeded the actual value of the mortgaged properties; (b) place properties in the names of investors or limited liability companies while retaining exclusive control of such properties and causing such investors to borrow funds from traditional lending institutions that far exceeded the value of such properties; and (c) sell and re-sell properties among numerous affiliated companies to further inflate the apparent value of such properties to obtain investments and financing that far exceeded the value of such properties.

5. To date, the Trustee has identified approximately 390 properties used by the Debtor and Puff to perpetrate this fraudulent scheme.

6. The Debtor and Puff randomly placed title to properties in the name of investors and randomly granted mortgages to investors without the investors' input, knowledge or control. These transactions bear no resemblance to arms'-length real estate sale or finance transactions.

7. To the extent that any given investor holds a mortgage or has title to an income producing property or valuable property, it is mere happenstance. To the extent that any given

investor holds a mortgage or has title to an undeveloped property with little value, it also is mere happenstance.

8. The Debtor and Puff used investors as shills to take title to various properties. In a typical transaction, Puff would instruct the investor to acquire a property from the Debtor, one of the Debtor's affiliates or another investor. The acquiring investor was not required to supply the down payment. Instead, the Debtor and Puff arranged for the acquiring investor to borrow the funds to "purchase" the property from a traditional financial institution in his or her own name, even though the proceeds of the loan were remitted to the Debtor or Puff.

9. Even though the property was titled in the investor's name, the Debtor paid or caused to be paid the mortgage(s), taxes, insurance and related payments from its commingled funds during the period of ownership and, if the property were sold, the Debtor and the investor would split the proceeds.

10. In these transactions as well, the investors typically did not select the property purchased and most likely never visited the property purchased.

11. In addition, the Debtor and Puff churned the sales involving the investors and the affiliates to justify higher investor loans from financial institutions.

12. According to the Securities and Exchange Commission (the "SEC"), of the property sales reflected in the Debtor's records from January 1, 2004 through May 1, 2005, 56% of the sale proceeds generated (approximately $19 million) were generated from sales to the Debtor's investors, with an additional 21% (or approximately $6.1 million) generated from sales by the Debtor to investors who subsequently sold the properties to one of the Debtor's affiliates.

13. Since the debts owed to investors and to the financial institutions significantly exceeded the property values and the income generated, the Debtor and Puff relied on raising

money from new investors to pay the promised returns to investors whose investments had matured and who did not re-invest their money, to investors who contracted for monthly payments, to other investors as determined by the Debtor or Puff or to fund the mortgage payments and related property costs for properties titled in investors' names.

14. The Debtor commingled funds received from all sources and did not attempt to account for the sources of such funds. Funds required to purchase, renovate or maintain any given property were not necessarily expended from the income generated by that property or from the funds invested by the mortgage holder(s).

15. Likewise, the payments to any investor or mortgagee were not necessarily limited to the income generated from the property for which such investor held a mortgage or other interest.

16. Since the monthly mortgage payments owed on the properties exceeded the properties' aggregate revenue by over $300,000.00, the Debtor and Puff covered the shortfall by inducing further investments from investors.

17. Without the continued flow of funds from new investors, the Debtor and Puff could not have continued to operate.

18. On behalf of all persons and entities harmed by these fraudulent and unlawful activities, including investors, tenants, financial institutions and taxing authorities, the Trustee filed a motion on January 12, 2006 seeking, among other relief, authorization to sell all of the identified properties in a structured, professional program designed to maximize the value obtained. The factual statements set forth in the Motion and in the Trustee's Statement in further support of the Motion are incorporated herein by reference.

**B.      Mr. Bauerle's Objections Must Be Overruled**

19.     Mr. Bauerle asserts that he holds ownership interests in (a) 22 New Street, Bayonne, New Jersey (designated as property number 96), (b) 42 Block Street, Newark, New Jersey (designated as property number 128), (c) 284 Wainwright Street, Newark, New Jersey (designated as property number 35), (d) 14 Van Buren Avenue, Carteret, New Jersey (designated as property number 80) and (e) 19 Richmond Road, Edison, New Jersey (designated as property number 90).

20.     As demonstrated below, the Debtor, and now this estate, is the equitable owner of the properties in which Mr. Bauerle asserts a legal interest.  Thus, the Trustee is authorized to sell these properties.

21.     The Trustee has not ascertained that Mr. Bauerle holds a title interest in 21 New Street, Bayonne, New Jersey.  Attached as Exhibit A is a copy of a title report obtained by the Trustee that reflects that title to this property is held in the name of Dorothy Coleman, LLC.  Mr. Bauerle has not produced a recorded deed for this property.

22.     Mr. Bauerle readily concedes that the properties in question "were managed by NJAH/Wayne Puff" and that they "supposedly paid the mortgages, taxes, insurance, utilities, maintained the properties and collected the rents."

23.     However, Mr. Bauerle fails to acknowledge that he did not have to pay one cent to acquire the properties in question.

24.     Attached as Exhibit B are summaries of payment transactions for the properties in which Mr. Bauerle asserts an interest.  These spreadsheets confirm that the Debtor or one of its affiliates funded all costs of ownership including payment of utilities, mortgages taxes, homeowners insurance, maintenance and repair.

5

25. Exhibit B further evidences that the Debtor received insignificant, if any, income with respect to these properties.

26. Mr. Bauerle conspicuously fails to explain why the Debtor (or its affiliates) funded expenses that greatly exceeded the income, if any, generated from such properties.

27. The answer is that the Debtor, and not Mr. Bauerle, exercised all control and other indicators of property ownership.

28. Section 541(a)(1) of the Bankruptcy Code provides that a debtor's estate is comprised of **all legal and equitable interests** of the debtor in property as of the commencement of the case.

29. The United States Supreme Court has held that the scope of estate property under Section 541(a) is to be interpreted very broadly. *See United States v. Whiting Pools, Inc.*, 462 U.S. 198 (1983). *Cf. Elliott v. Frontier Properties/LP*, 778 F.2d 1416, 1419-1420 (9th Cir. 1985) (recognizing debtor's equitable interest in real property even though debtor did not hold legal title).

30. The mere fact that title to a property is in the name of an "investor" does not mean that the Debtor is not the owner based on its equitable interests in the Property. For example, it is well settled under New Jersey law that even if title is in the name of an individual, "a resulting trust will be declared in favor of the one paying the purchase price of property transferred to another unless it is shown that the payor manifested an intention that no resulting trust should arise." *Shayegan v. Baldwin*, 237 N.J. Super. 47, 49 (App. Div. 1989).

31. Further, an equitable interest can be created in real property even if title is in the name of another and a written agreement between the title holder and the Debtor does not exist. *See Weisberg v. Koprowski*, 17 N.J. 362 (1955) (holding that "resulting trust" was created for

6

real property where legal title is in the name of another); *Mitchell v. Oksienik*, 380 N.J. Super. 119, 129 (App. Div. 2005) ("Although the parties had not entered into a written agreement with regard to the purchase of the real property, formal written agreements are not necessary for a joint enterprise to exist"); *Coney v. Coney*, 207 N.J. Super. 63, 74 (Chancery Div. 1985) ("I find that the real property in this case was indeed acquired in contemplation of marriage. That contract was not expressed but certainly implied by all of the actions of the parties. The Court may impose a resulting trust where one party purchases property with consideration furnished in whole or in part by the other party with the intention by the title holder to hold the title in trust").

32. The Trustee therefore submits that there exist many grounds upon which this Court can conclude that this estate is the equitable and rightful owner of the properties in which Mr. Bauerle asserts a title interest.

33. Under Section 363(f)(5) of the Bankruptcy, the Trustee may sell the Properties free and clear of all interests if the holders of such interests "could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest[s]."

34. It is clear all of the objecting investors could be compelled to accept a money satisfaction of their mortgage or ownership interests. *See Securities and Exchange Commmision v. Tyler*, 2003 WL 21281646 (N.D. Tex. 2002) (Magistrate concluded that the Court appointed receiver could sell insurance policies in which investors acquired an interest by virtue of their investments in the defendant corporation); *Securities and Exchange Commission v. Capital Consultants, LLC*, 2004 WL 1080164 (D. Or. 2004) (Court ordered sale of equities owned in investor's name that were acquired through her investment with the defendant); *Securities and Exchange Commission v. Princeton Economic International Ltd.*, 84 F.Supp.2d 447, 448-449 (S.D.N.Y. 2000) (Court concluded that assets belonging to non-defendant subsidiary and affiliated

entities of the defendant are subject to the receivership and may be sold); *Securities and Exchange Commission v. American Capital Investments, Inc. et al,* 98 F.3d 1133 (9th Cir. 1996), *abrogated on other*, *Steel Company v. Citizens For A Better Environment* 523 U.S. 83 (1998) (Court held that receiver was vested with authorization to sell real properties owned by limited partnerships in which defendant was the general partner, and declared that the jurisdiction to sell the properties resulted from the receivership order, as opposed to the defendant's position as the general partner of the partnerships involved).

35. In *Securities and Exchange Commission v. Tyler*, 2003 WL 21281646 at *5 - *6, the Magistrate further explained and concluded that:

> The Receiver's investigation has identified the insureds on each of the 140 policies as well as the percentage of each policy owned by AFS investors.... In turn each investor knows the identity of each policy in which he/she invested, the percentage of his/her ownership and the annual premiums charged.
>
> In addressing the Receiver's motion the court is called on to decide whether the investments of AFS investors should be pooled in accordance with the request to market, sell and transact business or whether the investments of each should be segregated using a tracing method entitling each investor to a constructive trust *See* Restatement (First) of Restitution § 211(1) (1937) cited in *Liberte Capital Group v. Capwill,* 229 F.Supp. 2nd 799 (N.D.Ohio, 2002).
>
> Notwithstanding an individual's ability to trace assets, where such a procedure places one victim in a position superior to that of other victims, equity dictates that tracing rules be suspended. *Cunningham v. Brown,* 265 U.S. 1, 44 S.Ct. 424 (1924). *See also Wilson v. Wall,* 73 U.S. 83, 90 (1867). These principles are further addressed in *S.E.C. v. Forex Asset Management, LLC,* 242 F.3d 325, 331-32 (5th Cir.2001), affirming a decision of this court, and in *Liberte Capital Group, supra,* a case which also involved failed viatical life insurance investment programs.
>
> * * *
>
> It is not clear how many investments have already been lost due to the lapses in the policies. However, it is clear that a number have been lost on such basis. All of the investors who purchased interests in insurance policies from AFS are in essentially a similar situation as victims of fraud. All received the same "sales pitch" as embodied in Receiver's Hearing Exhibit 5 as presented to them by AFS, its agents and employees, including Larry W. Tyler. All entered into the same

8

agency/policy funding agreement with Trade Partners and the same tri-partite agreements between themselves, Trade Partners and Grand Bank, now known as Macatawa Bank Corp. Receiver's Hearing Exhibit 6. Finally, all have either lost their individual investments through the lapse of policies or have suffered substantial, if not irreparable impairment of their investments. Under such circumstances the property and assets of AFS, Larry W. Tyler and the relief defendants should be pooled for the benefit of all AFS investors. *See also United States v. Durham,* 86 F.3d 70, 71-73 (5th Cir.1996).

This reasoning is equally availing in this case.

36.   N.J.S.A. 14A:14-7, which governs the appointment of a receiver for a corporation such as the Debtor, provides that:

> When property of a corporation for which a receiver has been appointed is, at the time of such appointment, subject to one or more encumbrances, the Superior Court, upon the application of the receiver, may authorize the receiver to sell such property at public or private sale, clear of encumbrances, for such price and upon such terms as the court may approve. No such sale shall be authorized or made except upon prior notice to the holders of the encumbrances affecting such property, and unless the receiver demonstrates to the satisfaction of the court that the sale of such property may be reasonably expected to benefit general creditors of the corporation without adversely affecting the interests of the holders of the encumbrances. The proceeds of such sale shall be paid into court, there to remain until the further order of the court, subject to the same encumbrances which affected the property at the time of the sale.

37.   In *Ravin, Sarasohn, Cook, Baumgarten, Fisch & Rosen, P.C. v. Lowenstein Sandler, P.C.* 365 N.J.Super. 241, 249 (App.Div. 2003), the Court acknowledged that "[t]he power of a custodial receiver, like that of a statutory receiver, subject of course of the court's discretion, is great. It can include the power to sell assets of the company under the Court's supervision and, if necessary, the company itself."

38.   In *Wilkinson, Gaddis & Co. v. Shannon Lodge Sanatorium*, 132 N.J. Eq. 591, 632-633 (Ch. 1943), the Court acknowledged that as with a corporate receiver, a court of equity may authorize the sale of property of an equitable receivership free and clear of all liens.

39. Given the pervasive fraud demonstrated, the Trustee is authorized to sell the Properties free and clear of the interests asserted by Mr. Bauerle.

40. Thus, the Trustee respectfully submits that Mr. Bauerle's objections be overruled.

41. In the alternative, the Trustee respectfully requests that any relief granted to Mr. Bauerle be conditioned upon the entry of an Order: (a) compelling Mr. Bauerle to reimburse this estate for all funds expended to date to maintain the properties in question; (b) vacating all restraints granted that protect Mr. Bauerle from collection efforts by non-debtor parties; and (c) preserving the Trustee's right to seek all available relief and to pursue all available causes of action against Mr. Bauerle, including but not limited to avoiding and recovering the amount of all mortgage payments, taxes, insurance, and repair and maintenance costs actually paid by the Debtor with respect to the properties in question.

**C.    Conclusion**

WHEREFORE, the Trustee respectfully requests that the Court overrule all objections raised by Mr. Bauerle, and grant all of the relief sought in the Motion.

                                              FORMAN HOLT & ELIADES LLC
                                              Attorneys for Charles M. Forman, Chapter 7 Trustee


                                              By: */s/ Harry M. Gutfleish*
                                                    Harry M. Gutfleish

Dated:  May 24, 2006

M:\CMF\NJAH\AUCTION SALE\Investor Mtns & Obj to Sale\Alan Bauerle\Trustee's Response to Objections.doc