**NOT FOR PUBLICATION**

<div style="border:1px solid black">

**FILED**

JAMES J. WALDRON, CLERK

**JUNE 29, 2006**

U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY: s/ Ronnie Plasner, DEPUTY

</div>

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In Re: | Case No.: 05-60442 (DHS) |
| **NJ AFFORDABLE HOMES CORP.**, | Chapter 7 |
| Debtor. | Judge:    Donald H. Steckroth, U.S.B.J. |

## OPINION

### THE HONORABLE DONALD H. STECKROTH, BANKRUPTCY JUDGE

This is a bankruptcy case involving allegations of a complicated "Ponzi" scheme committed by the

Debtor, New Jersey Affordable Homes Corporation (hereinafter "NJAH"), its principal, Wayne Puff

(hereinafter "Puff"), and various corporate and individual affiliates of either NJAH or Puff.  Simply put,

NJAH and Puff orchestrated a massive scheme to defraud numerous investors and lending institutions of

millions of dollars.  The fraud perpetrated by NJAH and Puff involved inducing unsophisticated investors

hungry for a large return to invest funds in exchange for promissory notes secured by mortgages on

designated properties that far exceeded the actual value of the mortgaged properties, with the promise to

the investors of annual rates of return between 15% and 20%.  In short, "[s]ince the debts owed to

investors significantly exceeded the property values, [NJAH] and Puff relied on raising money from new

investors to pay the promised returns to investors whose investments had matured and who did not re-

invest their money, to investors who contracted for monthly payments, or to other investors as determined

by [NJAH] or Puff."  (*See Application in Support of Trustee's Motion for an Order Authorizing

Trustee to (A) Retain Joint Venture to Market and Sell Real Properties and to Provide Related

Services Pursuant to 11 U.S.C. §§ 327 and 328(a), (B) Sell Real Properties Free and Clear of All

Liens, Claims and Interests at Auction Pursuant to 11 U.S.C. §§ 363 and 105, and (C) Borrow up

to $500,000.00 and to Provide First Priority Priming Liens Pursuant to 11 U.S.C. §§ 364 and 105*,

¶ 31) (hereinafter "*Trustee App.*").  NJAH and Puff used approximately 390 properties in furtherance of

the fraudulent Ponzi scheme.

Presently before the Court is a motion filed by Charles M. Forman, the Chapter 7 Trustee for

NJAH, seeking authorization to sell the various properties free and clear of all liens, claims and interests

at auction pursuant to §§ 363 and 105 of the Bankruptcy Code (hereinafter the "Sale Motion").  The

Trustee is seeking to sell all of the properties "in a structured, professional program designed to maximize

the value obtained" on behalf of "all persons and entities harmed by [the] fraudulent and unlawful activities

[of NJAH and Puff], including investors, tenants, financial institutions, and taxing authorities."  (*Trustee

App.*, ¶ 6).  The Trustee submits that his proposed sale process "provides the most efficient and economical

2

means of beginning the long process of providing redress for the fraud committed by [NJAH], Puff and their

cohorts." (*Trustee App.*, ¶ 9). Objections to the Trustee's Sale Motion have been filed by interested

parties, including individual investors and financial lending institutions. Several of the objections have been

amicably resolved. The remaining objections are addressed in this Opinion.

In response to the omnibus Sale Motion filed by the Trustee, several interested parties have filed

cross-motions, albeit all seeking similar forms of relief. First, Dennis M. Orsini, who claims to be the record

title owner of at least four properties, filed a cross-motion seeking to "vacate the automatic stay, a

declaration that [he] is entitled to possession and control of real property he owns and for post-petition

rents." (*See Objection to Trustee's Motion to Market and Sell Real Property and Application in*

*Support of Cross-Motion to Vacate the Automatic Stay, a Declaration that Dennis Orsini is Entitled*

*to Possession and Control of Real Property He Owns for Post-Petition Rents*) (hereinafter "*Orsini*

*Cross-Motion*"). Second, Peter Burboeck, Axel Burboeck and Bernd Hefele, Esq., claimed investors in

the affiliated entities of NJAH, filed a cross-motion for the entry of an order "(i) lifting certain District Court

imposed restraints, (ii) enjoining the Trustee from selling cross-movants' properties, and (iii) granting cross-

movants the authority to sell certain properties, with all proceeds of the sale to be held in escrow." (*See*

*Notice of Cross-motion for the Entry of an Order (I) Lifting Certain District Court Imposed*

*Restraints, (II) Enjoining the Trustee from Selling Cross-Movants' Properties, and (III) Granting*

*Cross-movants the Authority to Sell Certain Properties, with all Proceeds of the Sale to be Held in*

*Escrow*") (hereinafter "*Burboeck Cross-motion*"). Third, Herman Gross, an apparent investor in NJAH

and a record title owner of at least two properties, along with Quality Homes Development Corporation[1] and H&W Properties, Inc.[2] filed a cross-motion for the entry of an order "(i) lifting certain District Court imposed restraints, (ii) enjoining the Trustee from selling cross-movants' properties, and (iii) granting cross-movants the authority to sell certain properties, with all proceeds of the sale to be held in escrow." (*See Notice of Cross-motion for the Entry of an Order (I) Lifting Certain District Court Imposed Restraints, (II) Enjoining the Trustee from Selling Cross-movants' Properties, and (III) Granting Cross-movants the Authority to Sell Certain Properties, with All Proceeds of the Sale to be Held in Escrow*) (hereinafter "*Gross Cross-motion*").

For the reasons that follow, the Court will grant the Trustee's Sale Motion to sell all the properties, 248 in total, not previously authorized by this Court, in the manner proposed therein. The cross-motions filed by Dennis Orsini, Peter Burboeck, Axel Burboeck, Bernd Hefele, Esq., Herman Gross, Quality Homes Development Corporation and H&W Properties, Inc. are thus denied.

## I.    Procedural History and Statement of Facts

The fraud committed by NJAH, its affiliated entities, and Puff was formally unmasked on September 12, 2005, when the Securities and Exchange Commission (hereinafter "SEC") filed a verified complaint against NJAH and Puff in the United States District Court for the District of New Jersey, Civil Action No. 05 Civ. 4403. (*Trustee App.*, ¶ 38). In the verified complaint, the SEC details a scheme whereby NJAH and Puff engaged in unregistered and fraudulent offerings of securities to raise more than

---

[1]Quality Homes Development Corporation was formed by Herman Gross for the sole purpose of acquiring, rehabilitating and selling real property in Irvington, New Jersey.

[2]According to Herman Gross, H&W Properties, Inc. was formed as a joint venture between himself and Wayne Puff, the principal of NJAH.

$40 million from at least 490 investors in New Jersey and other parts of the United States.  (*Trustee App.*,

¶ 39).  The securities offered by NJAH and Puff included promissory notes purportedly secured by real

estate mortgages, investment contracts and other evidences of indebtedness.  (*Trustee App.*, ¶ 39).

As outlined by the Trustee in his application to market and sell the real properties, the complaint

filed by the SEC alleges that NJAH and Puff, after locating prospective investors, promised that notes and

other investment instruments would provide guaranteed annual returns of 15% or more.  (*Trustee App.*,

¶ 39).[3]  It is clear NJAH and Puff misled these investors by failing to disclose that the real properties sold

to investors were overvalued; the liabilities to investors greatly exceeded NJAH's assets; NJAH and Puff

were utilizing funds raised from new investors to pay the interest and principal due to previous investors;

--------------------------------------------------

[3]A certification filed by the SEC in conjunction with its federal complaint against NJAH and
Puff described a typical transaction between NJAH and an investor in the following manner:  NJAH
would approach a potential investor about "buying" a home; the investor would "buy" the properties
with a mortgage loan that NJAH would obtain in the investor's name, and on which the investor would
be the signatory; while the mortgage company would issue the loan to the investor, NJAH would be
responsible for all monthly loan payments during the period of ownership, and NJAH would renovate
the properties for resale; when the properties were eventually sold, NJAH and the investor would split
the proceeds.  (*See Declaration of Terrence P. Bohan in Support of Commission's Motion for
Expedited Relief*, ¶ 41) (hereinafter "*Bohan Cert.*").  In several instances, the investor would submit
tax returns and financial statements to NJAH and the loan application would be approved by the
mortgage company to which NJAH forwarded the financial information.  The investor would sign the
mortgage documents as the borrower.  (*Bohan Cert.*, ¶ 41).  However, the investor sometimes would
not know who paid the down payment for the purchase of the house and, in addition, the investor
oftentimes did not select the house he or she purchased.  (*Bohan Cert.*, ¶ 41).  According to at least
one investor that purchased two properties, a bill would come each month for the two mortgage
companies holding liens against the properties.  The investor would then forward the billing statements
directly to NJAH, and he would assume that NJAH satisfied the mortgage payments.  (*Bohan Cert.*, ¶
42).  According to the complaint filed by the SEC, "through sales to nominee buyers – buyers NJAH
finds and whose credit NJAH uses to obtain mortgages used to fund the transactions – NJAH achieves
three goals: it retains full control over the properties, it records a sale that reflects an ever increasing
valuation on the properties, and it collects mortgage proceeds it uses to pay off its obligations to existing
investors."  (*Bohan Cert.*, ¶ 43).

neither NJAH nor Puff could legitimately provide annual returns of 15% or greater to the investors; and

NJAH was transferring substantial assets to Puff and his family. (*Trustee App.,* ¶ 39). The verified

complaint further alleges that in order to facilitate this massive fraud, NJAH and Puff utilized at least eighty-

two corporate entities owned or controlled by, or otherwise associated with, NJAH and Puff. These

corporations included: (1) entities described by Puff on guarantees given to certain investors as owned by

him; (2) entities for which Puff served as either officer, director or registered agent; and (3) entities that

NJAH used as vehicles to purchase or sell property. (*Trustee App.,* ¶ 39). NJAH and Puff allegedly

"inflated the price of real properties that purportedly secured the notes and other securities sold to investors

by engaging in sales and purchases with [the affiliated corporations] and without disclosing to investors that

the sale and purchase of real properties were not arms-length market transactions." (*Trustee App.,* ¶ 39).

Contemporaneously with the filing of its verified complaint, the SEC filed an application with the

New Jersey District Court seeking temporary restraints against NJAH and Puff. (*Trustee App.,* ¶ 40).

As a result of the allegations raised by the SEC against NJAH and Puff, the New Jersey District Court

issued an order to show cause preliminarily i) enjoining NJAH and Puff from violating Sections 5(a), 5(c),

and 17(a) of the Securities Act of 1933,[4] Section 10(b) of the Securities Exchange Act of 1934,[5] and

Exchange Act Rule 10b-5; ii) freezing the assets of NJAH and Puff; iii) requiring NJAH and Puff to

repatriate all assets held outside the United States; iv) appointing a receiver for NJAH; v) directing NJAH

and Puff to provide updated verified accountings; and vi) prohibiting the destruction, alteration or

concealment of documents. (*See Order to Show Cause, Temporary Restraining Order, and Order*

---

[4]15 U.S.C. §§ 77e(a), 77e(c), and 77q(a).

[5]15 U.S.C. § 78j(b).

6

*Freezing Assets and Granting Other Relief*, pg. 2) (hereinafter "*Order to Show Cause*").  The District

Court concluded that freezing the assets of NJAH and Puff was necessary to preserve the status quo, and

to protect the Court's ability "to award equitable relief in the form of disgorgement of illegal profits from

fraud and civil penalties, and to preserve the Court's ability to approve a fair distribution for victims of the

fraud." (*Order to Show Cause*, pg. 3).  The Court also determined that the appointment of a receiver was

necessary to i) preserve the status quo; ii) ascertain the true financial condition of NJAH and the disposition

of investor funds; iii) prevent further dissipation of the property and assets of NJAH; iv) prevent the

encumbrance or disposal of property or assets of NJAH and the investors; v) preserve the books, records

and documents of NJAH; vi) bring NJAH into compliance with the law; vi) be available to respond to

investor inquiries; and vii) determine if NJAH should undertake a bankruptcy filing.  (*Order to Show

Cause*, pg. 4).[6]   The District Court appointed Nicholas H. Politan as the Receiver for NJAH.   On

_____

[6]Pursuant to the order to show cause, any receiver appointed on behalf of NJAH would be
empowered to: i) "take and retain immediate possession and control of all of the assets and property,
and all books, records and documents of NJAH, and the rights and powers of it with respect thereto";
ii) "have exclusive control of, and be made the sole authorized signatory for all accounts at any bank,
brokerage firm or financial institution that has possession or control of any assets or funds of NJAH"; iii)
"pay from available funds necessary business expenses required to preserve the assets and property of
NJAH and its investors, including the books, records and documents of NJAH . . ."; iv) "take
preliminary steps to locate assets that may have been conveyed to third parties or otherwise
concealed"; v) "take preliminary steps to ascertain the disposition and use of funds obtained by [NJAH
and Puff] resulting from the sale of securities issued by NJAH"; vi) "engage and employ persons,
including accountants, attorneys and experts, to assist in the carrying out of the receiver's duties and
responsibilities hereunder"; vii) "make, demand, file or otherwise handle any claim under any insurance
policy held by or issued on behalf of NJAH, or its officers, directors, agents, employees, trustees or
other person affiliated with it, and to take any and all steps in connection with such policies"; viii) report
to the Court regarding the assets and liabilities of NJAH; ix) "if appropriate, file for relief and protection
under the federal Bankruptcy Code, on behalf of NJAH, after notice to all parties in this action"; x)
"take discovery in this action without further order of the Court"; and xi) "take such further action as the
Court shall deem equitable, just and appropriate under the circumstances upon proper application of

September 26, 2005, the District Court granted the preliminary injunction (hereinafter "Preliminary Injunction Order") requested by the SEC.

On October 5, 2005, the District Court entered an Order amending the Preliminary Injunction Order in at least three significant ways.  First, the Amended Preliminary Injunction Order restrained and enjoined all "persons"[7] from taking any actions against NJAH, any entities affiliated with NJAH, Wayne Puff, Kyu Nam Park, Gary Puff, Bruce Puff,[8] and "any investor or third-party who holds as of the date of this Order an interest in real or personal property and the proceeds thereof derived from transactions involving NJAH and/or [its affiliated entities], including property acquired with, from or through NJAH." (*See Amended Order Modifying and Granting Preliminary Injunction and Other Relief*, pg. 3) (hereinafter "*Amended Order*").  Second, the Amended Order restrained all "persons" from i) the commencement or continuation, including the issuance or employment of process, or a judicial, administrative, or other action or proceeding against NJAH, any of its affiliated entities, the relatives of Wayne Puff, and any third-party property interests that were or could have been previously commenced or to recover such a claim against NJAH, any of its affiliated entities, the relatives of Wayne Puff, and any third-party property interests; ii) the enforcement of a judgment against any property of NJAH, any of its affiliated entities, the relatives of Wayne Puff, and any third-party property interests; iii) any act to create,

---

the receiver."  (*Order to Show Cause*, pgs. 10-11).

[7]The Amended Order defined "persons" as "all individuals, partnerships, corporations, limited liability companies, municipalities, utilities and all creditors of, and parties who assert any lien, claim or interest in and to the assets of" NJAH, the affiliated entities of NJAH, Wayne Puff, Kyu Nam Park, Gary Puff, Bruce Puff, and any investor or third-party who holds an interest in real or personal property and the proceeds thereof derived from transactions involving NJAH or its affiliated entities, or both.

[8]Kyu Nam Park, Gary Puff, and Bruce Puff are allegedly relatives of Wayne Puff.

8

perfect, enforce or foreclose any lien against NJAH, any of its affiliated entities, and any third-party property interests; iv) any act to obtain possession of or exercise control over the property of or from NJAH, any of its affiliated entities, and any third-party property interests; v) any act to collect, assess, or recover a claim against NJAH, any of its affiliated entities, and any third-party property interests that arose prior to the Amended Preliminary Injunction Order; and vi) the setoff of any debt owing to NJAH, any of its affiliated entities, or any third-party property interests that arose before the entry of the Amended Preliminary Injunction Order.  (*Amended Order*, pgs. 3-4).

Third, and most significantly, the Amended Order expanded the powers and responsibilities of the Receiver for NJAH.  The Amended Order empowered the Receiver to, without limitation:

> (a) implement a sales process . . . to liquidate the real property and related assets of NJAH, [its affiliated entities], and any person or entity who holds title to real property acquired through investments and/or the purchase of securities from NJAH, and to hold the proceeds of such liquidation in trust for the benefit of creditors and other parties-in-interest to be paid in accordance with their lawful priorities under applicable law; (b) implement a process for the fair and equitable determination of investor and/or creditor claims through the submission of proofs of claim and interests and establishment of a bar date for the submission of such claims and interests by creditors and parties-in-interest; (c) review, reconcile and file appropriate applications with the Court to reduce, modify and/or expunge claims and interests as appropriate; (d) retain professionals, including but not limited to, attorneys, accountants, appraisers, auctioneers, sales agents, consultants and other professionals to assist the Receiver in carrying out his duties . . .; (e) engage in discovery concerning the acts, conduct, assets, liabilities, administration and other matters relevant to this action and the business of NJAH . . . ; and (f) institute proceedings to avoid and recover unlawful transfers and receivership property . . . .

> [(*Amended Order*, pgs. 5-6)].

On November 1, 2005, the Receiver filed a motion with the District Court seeking, *inter alia*, to file a bankruptcy petition on behalf of NJAH.  The District Court granted the Receiver's motion on November 16, 2005.  Consequently, on November 22, 2005, the Receiver filed a voluntary petition under Chapter 7 of the Bankruptcy Code on behalf of NJAH.  Charles M. Forman was appointed the Chapter 7 Trustee for the bankruptcy estate of NJAH.  By order dated November 22, 2005, the District Court withdrew the reference to the Bankruptcy Court pursuant to 28 U.S.C. § 157(d).  However, by order dated December 6, 2005, the District Court referred the bankruptcy case to this Court.  (*See Order: (i) Continuing Injunctive Relief in the Debtor's Bankruptcy Case; (ii) Referring Bankruptcy Case to United States Bankruptcy Court; and (iii) Granting Related Relief*) (hereinafter "*Order Continuing Injunctive Relief*").

In the December 6, 2005 Order Continuing Injunctive Relief referring the bankruptcy case to this Court, the District Court explicitly found it "necessary to continue the injunctive relief previously imposed and to grant to the Trustee certain of the powers, rights and responsibilities granted to the Receiver under the [Order to Show Cause, the Preliminary Injunction Order and the Amended Preliminary Injunction Order] so that the Trustee can properly and efficiently administer the Debtor's bankruptcy estate and to otherwise fulfill his statutory duties consistent with the Bankruptcy Code." (*Order Continuing Injunctive Relief*, pg. 3).  Under the December 6, 2005 Order, the comprehensive injunction imposed by the District Court continues to apply in this Court.  In addition, the December 6, 2005 Order specifically directed and empowered the bankruptcy trustee to

> implement an expedited sales process in the Bankruptcy Court that is
> consistent with this Order to liquidate the real property and related assets
> of NJAH, [its affiliated entities], and any person or entity who holds title

to real property acquired through investments and/or the purchase of
securities from NJAH, and to hold the proceeds of such liquidation
pending further Order or Orders of the Bankruptcy Court, provided that
the Trustee shall retain the right to abandon any of the real property and
related assets in accordance with the relevant provisions of the
Bankruptcy Code . . . .

[(*Order Continuing Injunctive Relief*, pg. 7)].

On January 11, 2006, the Chapter 7 Trustee for NJAH filed the present motion for an order

authorizing him to do the following: i) retain a "joint venture" comprised of DJM Asset Management, LLC

and Sheldon Good & Company Auctions NorthEast, LLC (hereinafter collectively the "Joint Venture")

to market and sell real properties pursuant to 11 U.S.C. §§ 327(a) and 328(a) of the Bankruptcy Code;

ii) sell real properties free and clear of all liens, claims and interests at one or more auctions pursuant to §§

363 and 105 of the Code; and iii) borrow up to $500,000.00 from DJM Asset Management, LLC and

to provide first priority priming liens to DJM Asset Management, LLC pursuant to §§ 364 and 105 of the

Bankruptcy Code.

In response to the Trustee's motion, myriad objections and cross-motions were filed by various

interested parties and several months of hearings and negotiations ensued.  Notably, as an element of the

fraud, some of the properties are titled in the name of NJAH, some are titled in the names of NJAH's

affiliated companies, and others are owned by investors that were acquired through investments made with

NJAH.  (*See Trustee App.*, ¶ 13).  After several hearings, this Court on April 17, 2006, entered an Order

approving the Trustee's retention of the Joint Venture to market and sell the real properties in accordance

with the terms and conditions of a "Services Agreement" executed between the Trustee and the Joint

Venture.  In a separate Order entered on April 17, 2006, the Court authorized the Trustee to borrow up

11

to $500,000.00 from the Joint Venture in accordance with the terms and conditions of a "Trustee Loan,

Mortgage and Security Agreement" executed between DJM Asset Management, LLC and the Trustee on

behalf of NJAH's bankruptcy estate, with a superpriority lien granted in favor of the Joint Venture on all

of the properties.  Further, and perhaps most significantly, in another Order entered on April 17, 2006, the

Court permitted the Trustee to sell 142 of the 390 properties, namely, all of those properties titled in the

name of NJAH.  In this regard, the April 17, 2006 Order approving the sale of the properties titled in the

name of NJAH provided in relevant part as follows:

> Pursuant to 11 U.S.C. § 363(f), all Properties sold shall be transferred to
> the ultimate purchasers free and clear of all interests, mortgages, liens,
> claims, judgments, encumbrances and charges of any kind or nature,
> including the liens granted to the Joint Venture in the Financing Order, with
> all such interests, mortgages, liens, claims, judgments, encumbrances and
> charges, including the liens granted to the Joint Venture in the Financing
> Order, to attach to the net proceeds of the sale in the order of their
> priority, with the same validity, force and effect that they now have or as
> otherwise directed by the Court upon prior notice to each person or entity
> asserting such interest, mortgage, lien, claim, judgment, encumbrance or
> charge.  Each sale, however, shall remain subject to all properly recorded
> and enforceable easements, rights of way and permissive or restrictive
> covenants, all outstanding code violations, and all valid tenancies.

Following this April 17, 2006 Order, 248 properties remain subject to the Trustee's Sale Motion and are

the subject of this decision.  These 248 properties are titled in the names of various third parties (hereinafter

collectively the "Title Holders"), and the properties may be encumbered by mortgages held by various

banks and other financial institutions (hereinafter collectively the "Institutional Lenders").

During the period of negotiations between the Trustee and the Institutional Lenders, counsel for the

Institutional Lenders expressed to the Trustee a willingness to consider consenting to the entry of a

"negotiated form of order . . . if additional notice is given to the Title Holders of the request for the entry

of that order." (*See Trustee's Application for an Order Establishing Supplemental Notice Procedures and Fixing Final Hearing Date*, ¶ 6) (hereinafter "*Supplemental Notice App.*"). Consequently, on April 24, 2006, the Trustee filed an application with the Court seeking an order establishing supplemental notice procedures for the benefit of the Title Holders (hereinafter the "Supplemental Sale Order") and fixing a final hearing date with respect to the motion to sell the remaining 248 properties. The Trustee proposed to serve supplemental notice of the motion to sell the remaining 248 properties upon the following categories of interested parties: i) Title Holders; ii) Institutional Lenders; iii) Office of the United States Trustee; iv) parties that the Institutional Lenders have identified for the Trustee; and v) all parties that filed notices of appearance in NJAH's Chapter 7 bankruptcy case. (*See Supplemental Notice App.*, ¶ 8). As additional notice to all potentially interested parties, the Trustee further proposed to publish notice of his request for the entry of the Supplemental Sale Order in the following local newspapers: the *Newark Star-Ledger*, the *Asbury Park Press*, and the *Camden Courier*. (*See Supplemental Notice App.*, ¶ 9). On April 28, 2006, the Court entered an Order establishing the supplemental notice procedures as contained in the application filed by the Trustee and fixed May 31, 2006 as the final hearing date for the Supplemental Sale Order. The April 28, 2006 Order permitted parties who had not previously filed an objection to the Trustee's Sale Motion to file an objection to the Sale Motion or Supplemental Sale Order with the Court on or before May 24, 2006.

13

The Trustee served a "Notice of Final Hearing and Request for Entry of an Order Authorizing Sale

of Real Property and Granting Related Relief upon the interested parties categorized in the Supplemental

Notice Application.[9]

──────────────────────

[9]This notice provided as follows:

PLEASE TAKE NOTICE that on May 31, 2006 at 10:00 a.m., or as soon thereafter as counsel may be heard, Charles M. Forman, trustee (the "Trustee") for the chapter 7 estate of NJ Affordable Homes Corp. (the "Debtor"), through his attorneys, Forman Holt & Eliades LLC and Cole, Schotz, Meisel, Forman & Leonard P.A., will appear before the Honorable Donald H. Steckroth at the United States Bankruptcy Court for the District of New Jersey, 50 Walnut Street, Newark, New Jersey 07102 and request that an order be entered authorizing the sale of those parcels of real property which are the subject of a motion filed by the Trustee on January 11, 2006 in which the trustee, on behalf of the Debtor's estate, asserts an equitable ownership interest and which are not titled in the name of the Debtor.

PLEASE TAKE FURTHER NOTICE that any such sale shall be free and clear of all liens, claims, interests and encumbrances pursuant to 11 U.S.C. §363 with all valid liens, claims, interests and encumbrances, if any, to attach to the net proceeds of the sale in the order of their priority, with the same validity, force and effect that they now have.

PLEASE TAKE FURTHER NOTICE that you may request additional information and copies of the proposed form of order and a schedule of the properties to be sold from the Trustee by writing to his attorneys at Forman Holt & Eliades LLC, 218 Route 17 North, Rochelle Park, New Jersey 07662, Attn. Harry M. Gutfleish, Esq. or Michael E. Holt, Esq.

PLEASE TAKE FURTHER NOTICE THAT OBJECTIONS TO THE RELIEF SOUGHT BY THE TRUSTEE MUST BE FILED WITH THE CLERK OF THE BANKRUPTCY COURT, 50 WALNUT STREET, NEWARK, NEW JERSEY 07102 AND SERVED UPON THE TRUSTEE'S ATTORNEYS, FORMAN HOLT & ELIADES LLC, 218 ROUTE 17 NORTH, ROCHELLE PARK, NEW JERSEY 07662, ATTN: HARRY M. GUTFLEISH, ESQ. AND MICHAEL E. HOLT, ESQ., AND COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, PA, 25 MAIN STREET, HACKENSACK, NEW JERSEY 07601, ATTN: MICHAEL D. SIROTA, ESQ. AND STUART KOMROWER, ESQ. ON OR BEFORE MAY 24, 2006 AT 5:00 P.M. IF YOU DO NOT TIMELY FILE AND SERVE AN OBJECTION THE MATTER MAY BE DEEMED UNCONTESTED AND THE RELIEF SOUGHT BY THE TRUSTEE MAY BE GRANTED BY THE COURT.

14

The Court held the final hearing for the Supplemental Sale Order on May 31, 2006. As established during the May 31, 2006 hearing, the remaining 248 properties can be best categorized in three ways: with respect to 32 of the properties, no objections have been filed; for 151 of the properties, objections have been filed by various Institutional Lenders, but not by any Title Holders; for the remaining 65 properties, objections have been filed by Title Holders, and in some instances, Institutional Lenders have also filed objections.[10]

Against this procedural and factual background, the Court will turn to its legal conclusions.

## II.    Discussion

At the outset, it must be acknowledged that this is not the typical bankruptcy case. Rather, as the District Court initially realized and this Court has recognized, the Trustee and *all* interested parties are faced with a tragic situation of unusual proportions. The fraudulent conduct committed by Puff and NJAH can only result in deleterious ramifications for all parties involved. As the District Court's orders make clear, the Receiver (and now the Trustee) was appointed to unravel the fraud, liquidate assets and pursue claims for the benefit of all creditors of this bankruptcy estate. Moreover, this Court must be mindful of the specific directive given by the District Court in both the Amended Preliminary Order and the Order Continuing Injunctive Relief; namely, for the Receiver (and now the Trustee) to implement an expedited sales process to liquidate the real property and related assets of NJAH, its corporate affiliates, "*and any person or entity who holds title to real property acquired through investments and/or the purchase of securities from NJAH*," and to "hold the proceeds of such liquidation pending further order of this

---

[10]Some of the objections have been resolved after the hearing.

Court." (Emphasis added)  It is clear to this Court the Trustee is attempting to carry out the District

Court's directive through the Sale Motion and seeking to preserve this Court's ability to oversee a fair

distribution to the victims of this fraud – both Title Holders and Institutional Lenders.[11]

As a preliminary matter, the Court is satisfied that the Trustee has complied with Federal Rules of

Bankruptcy Procedure 6004(c) and 9014 and has given proper and sufficient notice of the Sale Motion

to all interested parties, on multiple occasions, specifying the precise relief sought and affording those

affected parties with an opportunity to be heard.  *See Fed. R. Bankr. P.* 6004(c) (West 2006); *see also*

*Fed. R. Bankr. P.* 9014 (West 2006).  Therefore, any arguments that have been raised regarding lack of

adequate notice regarding the Sale Motion are rejected.

## A.      The Properties For Which No Objections Have Been Filed

As previously indicated, neither Title Holders nor Institutional Lenders have filed objections to the

Trustee's application to sell 32 out of the 248 properties.  Because adequate notice has been provided and

no objections have been filed, the Court will treat the Trustee's motion as uncontested with respect to these

32 properties.  Without question, "'[t]he granting of an uncontested motion is not an empty exercise but

---

[11]Notably, since his appointment, the Trustee has been responsible for "removing garbage, remediating municipal code violations, providing hot water and heat to tenants, repairing boilers, hot water heaters, windows and the like, and removing squatters . . . . ." (*See Trustee's Statement in Further Support of, and Response to Objections to, Motion for an Order Authorizing Trustee to (A) Retain Joint Venture to Market and Sell Real Properties and to Provide Related Services Pursuant to §§ 327 and 328(a), (B) Sell Real Properties Free and Clear of All Liens, Claims and Interests at Auction Pursuant to 11 U.S.C. §§ 363 and 105, and (C) Borrow Up to $500,000.00 and to Provide First Priority Priming Liens Pursuant to 11 U.S.C. §§ 364 and 105*, ¶ 19) (hereinafter "*Supplemental Trustee Stmt.*").  In reliance upon the District Court orders, the Trustee has expended at least $186,000.00 to insure, manage, preserve, maintain and repair the various properties; this figure does not account for accrued and unpaid obligations of roughly $100,000.00 for which the Trustee required post-petition financing.  (*Supplemental Trustee Stmt.*, ¶ 21).

requires that the court find merit to the motion.'" *In re Franklin*, 210 B.R. 560, 562 (Bankr. N.D. Ill.

1997) (quoting *Nunez v. Nunez (In re Nunez)*, 196 B.R. 150, 156-67 (B.A.P. 9th Cir. 1996)).  The

Court has reviewed and scrutinized the application to sell these uncontested properties, and for the reasons

expressed by the Trustee in the Sale Motion, the Court will permit the Trustee to sell these properties

pursuant to the Joint Venture Services Agreement.

> **B.** **Properties For Which Objections Have Been Filed**

The various objections to the Sale Motion interposed by the Title Holders and Institutional Lenders

essentially boil down to several central arguments.[12]

First, the objecting Institutional Lenders contend that the properties for which the Trustee seeks

permission to sell, which are titled in the names of non-debtor third parties, do not constitute property of

the estate under § 541(a) of the Bankruptcy Code and, as such, the Trustee is without authority to sell the

properties.   Section 541(a)(1) of the Bankruptcy Code provides that the filing of a voluntary bankruptcy

petition creates an estate comprised of "all legal or equitable interests of the debtor in property as of the

commencement of the case." *See* 11 U.S.C. § 541(a)(1) (West 2006). Without question, § 541(a)(1) is

---

[12]Without question, the majority of meaningful objections to the Sale Motion have been filed by
the Institutional Lenders.  In response to these objections, the Trustee submits "that none of the financial
institutions or other mortgage holders has standing to assert the rights of the titleholders or to assert that
the titleholders have been denied due process." (*See Letter of Counsel for the Trustee to the Court
dated May 25, 2006*).  While the Institutional Lenders do in fact raise legal arguments that are also
applicable to the Title Holders, the Institutional Lenders argue that *their* rights will be detrimentally
affected if the Sale Motion is approved.  For example, the Institutional Lenders submit that approving
the Sale Motion will divest them of their enforceable security interests in the properties and fail to
sufficiently protect their legitimate interests.  In reviewing the objections filed by the Institutional
Lenders, the Court is satisfied that they have standing in their own right to oppose the Sale Motion
proposed by the Trustee, and the Trustee's objection in this regard is overruled.

given broad application and includes "'all kinds of property, including tangible or intangible property, causes

of action . . . and all other forms of property currently specified in section 70a of the Bankruptcy Act.'"

*Westmoreland Human Opportunities, Inc. v. Walsh*, 246 F.3d 233, 241 (3d Cir. 2001) (citing *United*

*States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n.9, 103 S. Ct. 2309, 76 L. Ed. 2d 515 (1983)). *See*

*also Burgess v. Sikes (In re Burgess)*, 392 F.3d 782, 785 (5th Cir. 2004) (noting that the "'scope of

property rights and interests included in a bankruptcy estate is very broad: the conditional, future,

speculative or equitable nature of an interest does not prevent it from being property of the bankruptcy

estate'") (citations omitted); *In re Lock*, 329 B.R. 856, 858 (Bankr. S.D. Ill. 2005) ("The scope of estate

property is very broad and includes every conceivable interest held by the debtor in property") (citation

omitted).

Fundamentally, the question of whether an interest claimed by a debtor is property of the estate is

a matter of federal law; however, this Court must look to state law to determine whether and to what extent

the debtor has any legal or equitable interests in property as of the commencement of the case. *Abboud*

*v. The Ground Round, Inc. (In re The Ground Round, Inc.)*, 335 B.R. 253, 259 (B.A.P. 1st Cir. 2005)

(citing *Butner v. United States*, 440 U.S. 48, 55, 99 S. Ct. 914, 918, 59 L. Ed. 2d 136 (1979)). *See*

*also Segerstrom v. Segerstrom (In re Segerstrom)*, 247 F.3d 218, 223 (5th Cir. 2001) (noting that while

federal law determines the extent of a debtor's bankruptcy estate under § 541(a) of the Code, a debtor's

pre-petition rights in property are determined according to the applicable state law) (citations omitted).

The Court agrees with the Trustee's conclusion that based upon the unique facts and circumstances

of the fraud perpetrated by NJAH and Puff, the mere fact that title to a property is in the name of an

investor does not mean that NJAH does not have an equitable interest in the property, however speculative

18

that interest may be.[13]  As described above, in the typical transaction, title to the properties were "placed"

in the name of investors (sometimes, it is alleged, through forgery of deeds and mortgages) while NJAH

maintained *de facto* ownership and control over the properties as an element of the overall fraudulent

scheme.  Moreover, NJAH or one of its affiliated entities provided the investors with the funds to purchase

the properties, then paid the regular mortgage payments to the various Institutional Lenders, along with the

real estate taxes and carrying costs.  Indeed, the Bankruptcy Code "is not concerned with the 'technicalities

of title' when it comes to determining property of the estate."  *Richardson v. Clarke (In re Clarke)*, 332

B.R. 865, 870 (Bankr. C.D. Ill. 2005) (citing *Diviney v. Nations Bank of Tex. (In re Diviney)*, 211 B.R.

951, 963 (Bankr. N.D. Okla. 1997), *aff'd*, 225 B.R. 762 (B.A.P. 10th Cir. 1998)).  Thus, although bare

legal title to the disputed properties is in the name of people other than NJAH, under the peculiar facts of

this case NJAH has, at the very least, an equitable interest in the properties sufficient to make the real estate

property of the bankruptcy estate under § 541 of the Bankruptcy Code.  *Compare In re Clarke*, 332

B.R. at 870.

---

[13]As the District Court recognized in its various orders which are binding upon this Court, given
the expanse of the fraud committed by NJAH and Puff, it is simply unworkable for the Court to permit
discovery and hold hearings with respect to each of the 390 properties involved in the fraud.  While this
conclusion may affect a segment of the Institutional Lenders, protracted, costly, and lengthy
proceedings would certainly not benefit the individual investors and Title Holders who are seeking quick
recoveries and closure.  While the Court will not question the motivation of the Institutional Lenders in
filing multiple and repetitive objections, in part, on behalf of the investors and Title Holders, the Trustee
submits that it "is disingenuous, to say the least, for the [Institutional Lenders] to argue on behalf of
those whom they intend to sue in foreclosure proceedings or for deficiency claims."  (*Supplemental
Trustee Stmt.*, ¶ 25).  As the Trustee further contends, the Sale Motion and Supplemental Sale Order
were served upon 238 "investor/putative title owners.  It is significant, however, that only a few such
investors have filed objections.  This speaks volumes to the Trustee's claims that [NJAH] beneficially
owns such properties."  (*Supplemental Trustee Stmt.*, ¶ 26).

Second, the Institutional Lenders argue that even if the Court concludes that NJAH possesses an equitable interest in the disputed properties, the Trustee cannot sell the properties free and clear of all liens under § 363(f) of the Bankruptcy Code. As noted by the Bankruptcy Court for the Eastern District of Virginia in *In re Takeout Taxi Holdings, Inc.*, § 363(f) of the Bankruptcy Code is a "powerful tool" permitting a bankruptcy trustee "to maximize the recovery from an asset without being unduly entangled at an early stage of the proceedings in controversies concerning the existence, validity and priority of liens and other interests in the property sought to be sold." 307 B.R. 525, 529 (Bankr. E.D. Va. 2004). Instead, § 363(f) "allows a trustee to quickly cut through the potential morass of such controversies, promptly sell the property for the best price available and resolve those controversies at a later date." *Id.* This allows the Trustee to effectuate the overriding concept required in this case – to convert distressed properties into a fund for distribution to those affected. It is also the essence of a trustee's power and authority over property of the bankruptcy estate. Section 363(f) of the Code provides as follows:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –
>
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;[14]

---

[14]Section 363(f)(2) is not applicable in this case because the Institutional Lenders and those Title Holders that filed objections to the Sale Motion obviously do not consent to the sale of the properties.

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;[15]

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

[11 U.S.C. § 363(f) (West 2006)].

Section 363(f) is drafted in the disjunctive; that is, the sale free of the claimed interest can occur if any one of the conditions specified in the subsection has been satisfied.  *In re Takeout Taxi Holdings, Inc.*, 307 B.R. at 529; 3 *Collier on Bankruptcy* ¶ 363.06 (15th ed. rev. 2005).  Section 363(f) permits the bankruptcy court to authorize a sale free of "any interest" that an entity has in property of the estate. 3 *Collier on Bankruptcy* ¶ 363.06[1] (15th ed. rev. 2005).  Although the Bankruptcy Code does not define the scope of "interest" for purposes of § 363(f), "[c]ertainly a lien is a type of 'interest' of which the property may be sold free and clear."  *Id.*

Further, it has long been recognized that a bankruptcy court has the power to authorize the sale of property free of liens with the liens attaching to the proceeds of sale, without the consent of the lienholder.  3 *Collier on Bankruptcy* ¶ 363.06 (15th ed. rev. 2005).  *See also Allebach v. Thomas*, 16 F.2d 853, 855 (4th Cir.) (holding that bankruptcy proceedings "shall not affect the validity of [a] lien; but it nowhere says that this fact shall in any manner affect the remedy to enforce the lienor's rights.  The

---

[15]Section 363(f)(3) does not apply in this instance because the prices at which the properties will sell are unknown and it cannot be said definitively that the prices at which the properties will be sold are "greater than the aggregate value of all liens" on the properties.  To the extent any property sells for a value greater than the aggregate value of all liens on that property, § 363(f)(3) would permit such a sale, and this section would be applicable.

remedy may be altered, without impairing the obligations of the contract, so long as an equally adequate remedy is afforded"), *cert. denied*, 274 U.S. 744, 47 S. Ct. 590, 71 L. Ed. 1325 (1927).   As the Ninth Circuit Court of Appeals stated over a hundred years ago in *In re Jersey Island Packing Co.*:

> It is true that the bankruptcy act provides that liens such as the lienholders had under the trust deeds in this case shall not be affected by bankruptcy, but that is far from saying that such lienholders may, after the commencement of proceedings in bankruptcy against the debtor, proceed to enforce their liens or contracts in the manner prescribed in the instruments which create them; and this is true whether such lien is an ordinary mortgage, or a deed of trust with provision for a strict foreclosure by a notice and sale.  The provision of the bankruptcy act that a lien shall not be affected by the bankruptcy proceedings has reference only to the validity of the lienholder's contract.  It does not have reference to his remedy to enforce his right. The remedy may be altered without impairing the obligation of his [or her] contract, so long as an equally efficient and adequate remedy is substituted.  Every one who takes a mortgage, or deed of trust intended as a mortgage, takes it subject to the contingency that proceedings in bankruptcy against his [or her] mortgagor may deprive him [or her] of the specific remedy which is provided for in his [or her] contract.
>
> [138 F. 625, 627 (9th Cir. 1905)].[16]

The objections to the Sale Motion mainly focus upon § 363(f)(4) of the Code.  Notably, and like all of § 363(f), the purpose behind § 363(f)(4) "is to allow the sale of property of the estate free and clear of disputed interests so the liquidation of the assets is not unnecessarily delayed while the disputes are being litigated. *See In re Robotic Vision Sys., Inc.*, 322 B.R. 502, 506 (Bankr. D.N.H. 2005) (citing *Moldo v. Clark (In re Clark)*, 266 B.R. 163, 171 (B.A.P. 9th Cir. 2001)).  Succinctly, this is the concept behind

---

[16]Based upon this long-standing principle of bankruptcy law, the argument that the Institutional Lenders may be deprived of their contractual right to exercise the remedy of foreclosure with respect to any of the disputed properties is of no moment.

22

§ 363(f).  Here, the objecting Institutional Lenders argue that the Trustee cannot establish that the interests

in the various properties are subject to "bona fide disputes."

The phrase "bona fide dispute" is not defined in the Bankruptcy Code.   Nonetheless, courts

applying § 363(f)(4) have developed a standard for determining whether a "bona fide dispute" exists; that

is, courts will inquire "whether there is an objective basis for either a factual or legal dispute as to the

validity of the asserted interest."  *In re Taylor*, 198 B.R. 142, 162 (Bankr. D.S.C. 1996). Courts utilizing

this inquiry "have held the parties to an evidentiary standard; evidence must be provided to show factual

grounds that there is an 'objective basis' for the dispute."  *Id.* (citing *In re Collins*, 180 B.R. 447, 452

(Bankr. E.D. Va. 1995)).  Indeed, not any alleged dispute satisfies § 363(f)(4); rather, it entails "some sort

of meritorious, existing conflict."  *Id.* (citing *Atlas Mach. & Iron Works, Inc. v. Bethlehem Steel Corp.*,

986 F.2d 709, 715 (4th Cir. 1993)).  At least one court has noted that the evidentiary record required to

support a finding of a "bona fide dispute" for purposes of § 363(f)(4) depends upon a case-by-case

consideration of the following: i) the procedural posture of the case; ii) the need to expedite the sale; and

iii) the nature of the basis for determining that a dispute exists.  *In re Robotic Vision Sys., Inc.*, 322 B.R.

502, 506 (Bankr. D.N.H. 2005).  "At a minimum, a party must articulate in a pleading or in an argument

an objective basis sufficient under the facts and circumstances of the case for the court to determine that

a bona fide dispute exists.  *Id.  See also Milford Group, Inc. v. Concrete Step Units, Inc. (In re Milford*

*Group, Inc.)*, 150 B.R. 904, 906-07 (Bankr. M.D. Pa. 1992) (holding that the testimony of the debtor

as to the existence of a "bona fide dispute" was sufficient to allow the court to make a finding of the

existence of such a dispute for purposes of § 363(f)(4)).  Significantly, this standard does *not* require the

Court to resolve the underlying dispute or determine the probable outcome of the dispute prior to

23

authorizing a sale pursuant to § 363(f)(4), but merely whether such a dispute *exists*. *Id.* (citations omitted).

The Trustee bears the burden of showing that a bona fide dispute exists for purposes of § 363(f)(4). *See*

*In re Gulf States Steel, Inc.*, 285 B.R. 497, 507 (Bankr. N.D. Ala. 2002).

Contrary to the arguments raised by the Institutional Lenders, to qualify as a "bona fide dispute"

under § 363(f)(4) "the propriety of the lien does not have to be the subject of an immediate or concurrent

adversary proceeding" under Federal Rule of Bankruptcy Procedure 7001. *Union Planters Bank, N.A.*

*v. Burns (In re Gaylord Grain L.L.C.)*, 306 B.R. 624, 627 (B.A.P. 8th Cir. 2004) (citations omitted).

*See also In re Collins* 180 B.R. at 452 n.8 ("We recognize, however, that to be a 'bona fide dispute'

under § 363(f)(4), the propriety of the lien does not necessarily have to be the subject of an immediate or

concurrent adversary proceeding"). Consequently, although the Trustee did not file an adversary

proceeding seeking to avoid or determine the validity of the various liens on the disputed properties, he may

nevertheless sell the properties free and clear of the Institutional Lenders's liens if he can establish "bona

fide disputes" under § 363(f)(4) of the Code. *Compare In re Gaylord Grain L.L.C.*, 306 B.R. at 628.

Under the circumstances of this case, the Court is satisfied the Trustee has met his burden of setting

forth sufficient evidence demonstrating that a "bona fide dispute" exists for purposes of § 363(f)(4) for

several reasons. First, in conjunction with the SEC complaint, the SEC filed the verification of Terrence

P. Bohan, Branch Chief in the examination program at the Northeast Regional Office of the SEC. (*See*

*generally Bohan Cert.*). This certification, part of the record in this case, reveals that Bohan, beginning

in April of 2005, was assigned to conduct an examination with respect to the then suspect conduct of

NJAH and Puff. As part of his examination, Bohan objectively inspected documents provided by NJAH

and documents received from third parties. (*Bohan Cert.*, ¶ 4). Moreover, Bohan interviewed NJAH

24

investors, NJAH's corporate counsel, and other employees of NJAH.[17]  As part of his detailed verification

filed with the District Court, Bohan summarized the facts surrounding one NJAH investor as follows:

> In my conversation with Mr. Waggoner, he told me that sometime this winter, NJAH approached him about "buying" two houses and proposed the following transaction: Mr. Waggoner would buy the properties with a mortgage loan that NJAH would obtain in his name, and on which he would be the signatory.  Even though the mortgage company would issue the loan to Waggoner, NJAH would be responsible for all monthly loan payments during the period of ownership, and would renovate the properties for resale.  Then, when the properties were sold, NJAH and Mr. Waggoner would split the proceeds.  After he agreed to the proposal, Mr. Waggoner submitted tax returns and financial statements to NJAH and his loan was approved by the mortgage company to which NJAH forwarded his financials.  He signed the mortgage documents as borrower.  He does not know who paid the down payment for the purchase of the houses, but he assumes NJAH did.  Mr. Waggoner did not select the houses he purchased, and has never seem them.  No one told Mr. Waggoner that one property was being sold by a NJAH affiliate or that the other had once been owned by NJAH.

> According to Mr. Waggoner, each month, a bill comes from the two mortgage companies now holding his mortgages on the two properties.  Mr. Waggoner sends the statements directly to NJAH and he assumes that NJAH pays them.  He reported that NJAH's payments are sometimes late, because he receives the late notices.  All taxes and insurance are paid as part of the monthly mortgage payment.

> As Mr. Waggoner's experience makes clear, through sales to nominee buyers – buyers NJAH finds and whose credit NJAH uses to obtain mortgages used to fund the transactions – NJAH achieves three goals: it retains full control over the properties, it records a sale that reflects an ever increasing valuation on the properties, and it collects mortgage proceeds it uses to pay off its obligations to existing investors.  But it also

---

[17]Bohan attached to his verification filed with the District Court the declarations of five NJAH investors who described the oral and written representations made by NJAH and Puff, their investments in notes and their inability "to get their money out of NJAH."  (*Bohan Cert.*, ¶5).

assumes new obligations in the form of the mortgage payments it agrees
to pay that are not reflected on its balance sheet.

[(*Bohan Cert.*, ¶¶ 41-43)].

Second, in addition to relying upon the SEC complaint and accompanying verification of Terrence Bohan, the Trustee presented to the Court the certification of William Waldman, counsel for the Trustee.[18] According to Waldman, he performed a "random sample of various investor property files which were maintained by [NJAH] and turned over to the Trustee." (*See Certification of William L. Waldman in Further Support of Trustee's Motion for Authorization Pursuant to 11 U.S.C. §§ 363 and 105 to Sell Real Property Free and Clear of All Liens, Claims and Interests at an Auction Sale*, ¶ 2) (hereinafter "*Waldman Cert.*").[19]  By way of example, with respect to investor Bartholomew O'Connor, the examination made by Waldman on behalf of the Trustee uncovered the following:

The "Property Files" for Bartholomew O'Connor reflect that:

A.    According to a HUD-1 Statement issued in connection with 177 S. 9th Street, Newark, New Jersey, the Debtor transferred the property to the name of Bartholomew O'Connor on or about June 30, 2005 for $380,000.00.  A purported loan to First United Mortgage was entered into on such a date in the sum of $304,000.00 [Exhibit "A"].  The Property Files reflect that the Debtor received bills from Washington Mutual on behalf of Bartholomew O'Connor and paid the same through its affiliate,

---

[18]The certification of William Waldman was admitted into evidence at the hearing conducted on February 23, 2006.  The objecting parties had the opportunity to cross-examine Waldman during the hearing.

[19]Waldman also reviewed the files for the following investors: Bartholomew O'Connor, Mark Cammisa, Jamie Haberman, and Dennis Orsini, which, according to Waldman, were "consistent" with the other samples reviewed.  (*Waldman Cert.*, ¶ 2).

Quality Homes Are Us Property Management [Exhibit "B"]. The Property Files reflect that the Debtor handled the insurance, taxes, and water, on the property and paid for repairs to the property [Exhibit "C"].

B.   With respect to 284 S. 11th Street, Newark, New Jersey, Mr. O'Connor executed a source of funds document indicating that he was obtaining the sum of $92,000.00 from his account with "NJ Afford secured savings." This purportedly represented the difference between the purchase price and the loan amount [Exhibit "D"]. The Debtor's Property Files reflect bills from Washington Mutual Home Loans on account of this property [Exhibit "E"] and the Debtor handled the insurance, taxes, water bills and property repairs [Exhibit "F"].

C.   With respect to the property located at 195 Reynolds Street, Orange, New Jersey similar to above, the Property Files reflect that the Debtor received bills directly from Washington Mutual and paid the monthly amounts due directly and through its affiliate Quality Homes Are Us Property Management [Exhibit "G"]. The Property Files also reflect that the Debtor obtained and paid for homeowners insurance and made improvements to the property [Exhibit "H"].

D.   With respect to the properties titled in the name of Bartholomew O'Connor, there is no evidence in any of the above Property Files that Mr. O'Connor paid the difference between the contract sale prices for such properties and the loans on such properties.[20]

[(*Waldman Cert.*, ¶ 3(A) - (D)].

Third, and quite significantly, on the very eve of the May 31, 2006 hearing, several adversary proceedings were filed by a host of Institutional Lenders against the Trustee. In general, these adversary

---

[20]These findings were representative of the investigation conducted by Waldman. The certification filed by Waldman is accompanied by voluminous records obtained from NJAH.

proceedings seek a declaratory judgment that i) neither NJAH nor the Trustee holds legal title to any of the

mortgaged properties; ii) neither NJAH nor the Trustee holds equitable title to any of the mortgaged

properties; iii) neither NJAH nor the Trustee holds a legal interest in any of the mortgaged properties; iv)

neither NJAH nor the Trustee holds an equitable interest in the mortgaged properties; v) the Trustee has

no authority to sell the mortgaged properties; and vi) the complaining Institutional Lenders hold valid,

perfected, enforceable mortgage liens against the mortgaged properties.[21] As the Trustee contended during

oral argument at the May 31, 2006 hearing, and this Court agrees, the very filing of these adversary

proceedings by the Institutional Lenders acknowledges that bona fide disputes exist with respect to the

remaining disputed properties.

The Court finds that the exceptional facts of this case and its particular procedural posture demand

an expedited sale of the disputed properties.  This is the only plan capable of benefitting the largest number

of injured parties.  Based upon the facts contained in the SEC complaint and the accompanying verification

of Terrence Bohan, the Waldman certification and its accompanying documentation, the arguments

advanced by the opposing parties during the course of the several hearings conducted by the Court, and

the adversary proceedings filed by the Institutional Lenders, the Court is satisfied that the Trustee has

produced sufficient evidence to demonstrate "an objective basis for either a factual or legal dispute as to

---

[21]See, for example, the complaints filed against the Trustee by National City Mortgage
Company, American Fidelity Mortgage Corporation and Washington Mutual Bank, Adversary
Proceeding Numbers 06-1873 (DHS), 06-1928 (DHS), and 06-1872 (DHS), respectively.

the validity of the asserted interests" in the disputed properties. *See In re Taylor*, 198 B.R. at 162.

Consequently, the Trustee has satisfied its burden pursuant to § 363(f)(4) of the Bankruptcy Code.[22]

The objecting Institutional Lenders further argue that the Trustee should not be authorized to sell

the disputed properties because he has not offered adequate protection in connection with the proposed

sale of the properties.    To be sure, § 363(e) of the Bankruptcy Code provides as follows:

"[n]otwithstanding any other provision of this section, at any time, on request of an entity that has an interest

in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with

or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate

protection of such interest."  11 U.S.C. § 363(e) (West 2006).  In turn,  it is recognized that § 363(p) of

the Bankruptcy Code explicitly provides that the trustee has the burden of proof on the issue of adequate

protection.  *See* 11 U.S.C. § 363(e) (West 2006).

"The concept of adequate protection finds its basis in the Fifth Amendment's protection of property

interests."  *In re DeSardi*, 340 B.R. 790, 797 (Bankr. S.D. Tex. 2006) (citing H.R. Rep. No. 95-595,

338-40 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 6294-6297).  Simply put, the notion of adequate

protection is grounded in the belief that secured creditors should not be deprived of the benefit of their

bargain. *Id.  See also Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev.

Group, Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) ("'The whole purpose of adequate protection for a

creditor is to insure that the creditor receives the value for which [it] bargained pre-bankruptcy'") (citation

omitted).  The term "adequate protection" is intended to be a flexible concept.  *See* 3 *Collier on*

---

[22]Based upon this conclusion, the Court need not address whether the Trustee also satisfies §
363(f)(5) of the Bankruptcy Code, another issue contested by the Trustee and the Institutional Lenders.

*Bankruptcy* ¶ 363.05 (15th ed. rev. 2005).  While § 361 of the Bankruptcy Code provides several

examples of adequate protection, these examples are not limiting "and the circumstances of the case will

dictate the necessary relief to be given."  *Id.*  The award of adequate protection is a matter within the

discretion of the bankruptcy court.  *In re Swedeland Dev. Group, Inc.*, 16 F.3d at 564; *Zink v.*

*Vanmiddlesworth*, 300 B.R. 394, 402 (N.D.N.Y. 2003) (citation omitted).  In addition, the granting of

adequate protection in favor of a secured creditor is made on the proverbial case-by-case basis.  *MBANK*

*Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396 (10th Cir. 1987) (citation omitted).

*See also In re Swedeland Dev. Group, Inc.*, 16 F.3d at 564.

In this instance, and once again considering NJAH's fraudulent conduct and the circumstances

surrounding the posture of this bankruptcy case, the Court finds that the professionally crafted marketing

and sale procedures developed by the Trustee and the Joint Venture will provide adequate protection to

the Title Holders and Institutional Lenders notwithstanding the priming liens given to the Joint Venture.  In

support of his argument that the marketing and sale procedures provide adequate protection to the

Institutional Lenders, the Trustee submits as follows:

> [A]fter considering the objections filed, the Trustee and the Joint Venture
> have agreed to a procedure that will spread the costs of the financing and
> the marketing and auction process among the Properties that ultimately will
> be sold.  After the conclusion of the auction of the Properties, the Trustee,
> in consultation with the Joint Venture, will make an initial *pro rata*
> allocation of the Liabilities under the Trustee Loan Agreement, including
> the JV Expenses, to each of the Properties that have been sold at the
> auction (the "Initial Allocation").  Upon the closing of the sale of each of
> the Properties, the following payments will be made: (a) the 10% Buyer's
> Premium will be paid to the Joint Venture; (b) Valid Tax Liens will be
> paid, and (c) the Joint Venture will be repaid on account of the Liabilities
> (including the JV Expenses) an amount based on the Initial Allocation.

The Trustee will deposit all remaining proceeds from the sale of the Properties in his Trustee account, which shall remain subject to the superpriority liens of the Joint Venture, and all other valid interests. No payments will be made to any party other than the Joint Venture until all Liabilities (including JV Expenses) are paid in full. To the extent that, based on the Initial Allocation, there are insufficient funds to pay the Joint Venture all Liabilities (including all JV Expenses) in full after all of the sales have closed (because, for example, the sales of one or more of the Properties failed to close), the Trustee will reallocate the Liabilities to all of the Properties for which closings take place, and will pay to the Joint Venture the balance owing to it.

By way of example, if Liabilities under the Trustee Loan equal $1,250,000.00 (comprised of principal, interest, the Joint Venture's attorneys' fees and expenses, and the JV Expenses), then the amount allocated to each of the Properties that is sold will be approximately $3,205.00 ($1.25 million divided by 390). Each additional increment of $100,000.00 represents a cost of only $256.00 per property. While the [o]bjectors' arguments are rife with vitriol, they are not responsive to the economic realities presented. The Trustee respectfully submits that (a) the prorated amount is a mere pittance compared to the loan amounts purportedly due to the [o]bjectors, (b) his proposed sale process has produced economies of scale that cannot be replicated if each of the 390 Properties were individually marketed and sold, and (c) the prorated amounts are significantly less than the [o]bjectors would incur for real estate taxes and insurance for the year or more that it will take to obtain a foreclosure judgment and consummate a foreclosure sale.

Thus, and as testified to at the February 16, 2006 hearing by Jeffrey Hubbard, Executive Managing Director and Partner of Sheldon Good & Company, the mortgage interests will be enhanced and protected by the professional marketing and sale process, in part by the low "per property cost" to bring all of the properties to sale. Certainly, the economies of scale weigh in favor of this proposal over individual marketing of the disputed properties. The total costs will be substantially less than if each of the 390 properties were individually marketed and sold. Further, it must not be forgotten that the interests of the

Title Holders and Institutional Lenders will attach to the proceeds of sale and will be afforded the rights and

priorities as ultimately determined by this Court at a future hearing.  As the Trustee stated during the May

31, 2006 hearing, "[i]f there is a valid mortgage that needs to be paid from the proceeds of sale, that

mortgage gets paid."  Finally, contrary to the arguments advanced by the Institutional Lenders that the

Trustee has failed to carry his burden of establishing factual evidence to support the Sale Motion, the record

before the Court is well developed and without question goes far beyond the record before the District

Court at the time the District Court ordered the properties to be sold by the Receiver for NJAH.[23]

Consequently, and based upon all of the foregoing, the Court concludes that the Trustee has satisfied the

prerequisites for selling the disputed properties pursuant to § 363 of the Bankruptcy Code.  Nevertheless,

the Court encourages the Trustee to continue to discuss with Institutional Lenders and Title Holders to

amicably resolve any individual situation that the Trustee, in his discretion, feels is warranted.  To that end,

the Trustee is free to remove any property encompassed by the Sale Motion, if appropriate.

        In opposing the Sale Motion, the Institutional Lenders argued they were deprived of their right to

credit bid at the auction sale.  Stated another way, the auction proposed by the Joint Venture does not

afford the Institutional Lenders the right to credit bid pursuant to § 363(k) of the Bankruptcy Code.

Section 363(k) of the Bankruptcy Code provides as follows:

> At a sale under subsection (b) of this section of property that is subject to
> a lien that secures an allowed claim, unless the court for cause orders
> otherwise the holder of such claim may bid at such sale, and, if the holder

---

[23]In addition to the SEC complaint, this Court reviewed the written objections filed by the
Institutional Lenders and Title Holders, heard all of the arguments raised by the objecting parties, took
the testimony of several witnesses, read the factual certifications filed by the Trustee and the objecting
parties, and listened to many individual investors who admitted to being defrauded by NJAH and Puff.

of such claim purchases such property, such holder may offset such claim
against the purchase price of such property.

[11 U.S.C.A. § 363(k) (West 2006)].

While it is the ordinary case that a secured creditor has the opportunity to credit bid its entire claim in a sale under § 363(b) of the Code, § 363(k) gives the court discretion to deny the ability to credit bid for "cause."  *See In re 222 Liberty Assocs.*, 108 B.R. 971, 979 (Bankr. E.D. Pa. 1990) (noting that the language of § 363(k) does not expressly provide that a creditor has the right to credit bid when property is being sold pursuant to a reorganization plan); *Aetna Realty Invs., Inc. v. Monarch Beach Venture, Ltd. (In re Monarch Beach Venture, Ltd.)*, 166 B.R. 428, 433 (recognizing the "discretionary language of § 363(k)").  The term "cause" is not defined in § 363 of the Bankruptcy Code, but it is intended to be a flexible concept enabling a court to fashion an appropriate remedy on a case-by-case basis.  Further, the language of § 363(k) does not prohibit a bankruptcy court from placing conditions upon a secured creditor's ability to credit bid.

In this instance, the Court will permit the Institutional Lenders to credit bid the full value of their respective claims under § 363(k) of the Code.  However, with respect to each property, if a credit-bidding Institutional Lender is the successful bidder at the auction sale, then that Institutional Lender shall be subject to the terms of the April 17, 2006 "Order Authorizing Retention of Joint Venture to Market and Sell Properties Pursuant to 11 U.S.C. §§ 327 and 328(a), and Authorizing Payment of Compensation and Expenses."  Specifically, subsection I.B. provides as follows:

As compensation for services performed by the [Joint Venture] hereunder,
the [Joint Venture] shall be entitled to a commission on the sale of every

33

Property equal to ten percent (10%) of the highest bid for such Property (the "Buyer's Premium"). In calculating the total sales price for each Property, the Buyer's premium shall be added to the highest bid for such Property. The Buyer's Premium shall be paid by the buyer of each Property on the date of the closing of the sale of the Property and shall be free and clear of all liens, claims, interests, and encumbrances.

Consequently, while the Institutional Lenders shall have the right to credit bid at the auction sale, any Institutional Lender that is the successful bidder with respect to each individual property shall be required to pay the ten percent (10%) "Buyer's Premium" to the Joint Venture. This Buyer's Premium is, of course, in lieu of the costs a lender would incur to foreclose, market, and sell the property. The record before the Court demonstrates that when the costs of effectuating the necessary global liquidation of the disputed properties are allocated on a property-by-property basis, the overall costs to the Institutional Lenders should be less than if the Institutional Lenders initiated protracted foreclosure proceedings and marketing efforts against each of the disputed properties.

While the Court will grant the Sale Motion for the sale of all disputed properties, the Court will require the proceeds from the sale of each disputed property to accrue interest and be separately accounted for pending a determination by this Court of the respective priority rights and ownership interests of the various Institutional Lenders and Title Holders.

## III.    Conclusion

In granting the relief sought by the Trustee, the parties hopefully understand and appreciate that the scope of the fraud perpetrated by NJAH and Puff is larger than any single investor or financial lending institution, and that a global resolution towards liquidation and distribution is required. This was initially

34

Case 05-60442-DHS    Doc 526    Filed 06/29/06    Entered 06/30/06 09:15:47    Desc Main
Document      Page 35 of 35

recognized by the District Court and is further acknowledged in this Opinion. The Court is mindful that not all parties will be satisfied, but it is simply impossible to fully remedy everyone's damages at this point. Notably, the Trustee is not the cause of the current predicament facing all parties affected by the fraudulent scheme. Rather, in taking directive from the District Court to liquidate all of the properties, the Trustee has presented a coherent and carefully crafted plan to provide some measure of relief to interested parties. Liquidating the properties will create a fund to help offset damages to individual investors, and all valid and perfected security interests in the properties will attach to the proceeds of sale. While the competing interests in the properties will be adjudicated at a later date, at least deteriorating assets will have been sold and proceeds made available. In summary, and for the reasons expressed above, the Court will grant the Sale Motion to sell the remaining 248 properties as proposed by the Trustee.

An Order in conformance with this Opinion has been entered by the Court and a copy is attached.


s/    **Donald H. Steckroth**

_____
DONALD H. STECKROTH
UNITED STATES BANKRUPTCY JUDGE


Dated: June 29, 2006

35