**FILED**

JAMES J. WALDRON, CLERK

**SEPT. 13, 2007**

U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY:  s/ Ronnie Plasner, DEPUTY

**NOT FOR PUBLICATION**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

In Re:                                    Case No.:   05-60442 (DHS)

**NJ AFFORDABLE HOMES CORP.,**            Judge: Donald H. Steckroth, U.S.B.J.

　　　　　　　　　Debtor.

## OPINION

**THE HONORABLE DONALD H. STECKROTH, BANKRUPTCY JUDGE**

Before the Court are two motions filed by Charles M. Forman, as Chapter 7 Trustee for NJ Affordable Homes Corp. (hereinafter "Trustee" and "Debtor" respectively). The first seeks an order approving settlements between the Trustee and certain institutional lenders who are defendants in adversary complaints filed by the Trustee, as well as authorizing a sale of real properties free and clear of liens, claims and encumbrances ("Settlement").  The settling lenders include: (i) National City Mortgage Co., a subsidiary of National City Bank; (ii) Washington Mutual Bank f/k/a Washington Mutual Bank FA; (iii) Countrywide Home Loans, Inc.; (iv) Credit Suisse Financial Corporation f/k/a Credit Suisse First Boston Financial Corporation; (v) GMAC Mortgage LLC f/k/a GMAC Mortgage Corporation; (vi) Sovereign Bank; (vii) Mortgage Electronic Registration Systems, Inc., nominee for Finance America LLC d/b/a FinAm LLC; (viii) U.S. Bank National Association, as trustee for MASTR Alternative Loan Trust 2005-ABI, by its attorney-in-fact, Wells Fargo Bank NA s/b/m to Wells Fargo Home Mortgage, Inc.; and (ix) ABN-AMRO Mortgage Group, Inc. (hereinafter "Lenders").

Opposition was filed to the settlement and sale motion by several individual investors who argue, in the main, the settlement is not in the best interest of the Estate or general creditors.

In the event the settlement and sale motion is granted, the Trustee also seeks an order approving his continued retention of DJM Asset Management LLC and Sheldon Good & Company Auctions Northeast LLC (hereinafter "Joint Venture"), in accordance with an amended services agreement to market and sell the real properties, and authorizing post-petition financing to fund the auction sale up to $500,000 from the Joint Venture in consideration for liens and superpriority

administrative expense status, pursuant to 11 U.S.C. §§ 364 and 105 ("Amended Agreement").  The

Joint Venture motion is opposed by the Keitz Defendants and the Koenigshof Defendants.

For any and all reasons stated hereafter, the Trustee's motions are granted with the single

exception that bidders at the first auction allegedly in breach for failure to close upon their purchase

shall not be precluded from bidding at the auction sale authorized herein.  The Court has jurisdiction

pursuant to 28 U.S.C. § 1334, and the December 5, 2005 Order of Reference from the United States

District Court for the District of New Jersey.  These matters are core proceedings pursuant to

28 U.S.C. §§ 157(b)(2)(A), (D), (M), (N) and (O).  Venue is proper under 28 U.S.C. §§ 1408 and

1409.

### **Statement of Facts and Procedural History**

**Background as to Settlement and Sale Motion**

On September 12, 2005, the Securities and Exchange Commission (hereinafter "SEC") filed

a verified complaint against the Debtor, and its principal Wayne Puff, in the United States District

Court for the District of New Jersey, Civ. No. 05-4403.  The SEC's complaint alleged a scheme in

which the Debtor and Mr. Puff engaged in unregistered and fraudulent offerings of securities to

approximately 500 investors throughout the United States.  The SEC complaint alleged that: (i) the

real properties were overvalued; (ii) liabilities to investors greatly exceeded the Debtor's assets; (iii)

the Debtor and Mr. Puff were using subsequent investments to pay prior investors their promised

returns; (iv) the Debtor was at no time economically sustainable and operated as a Ponzi scheme;

and (v) the Debtor was transferring substantial assets to Mr. Puff, his family, and personal friends.

On that same date, the District Court entered an "Order to Show Cause, Temporary Restraining Order and Order Freezing Assets and Granting Other Relief" in the SEC action (hereinafter "TRO"). The Debtor, Mr. Puff and their affiliates were directed to preserve their assets and were precluded from disposing of or encumbering same. Also, pursuant to the TRO, Nicholas H. Politan was appointed as Receiver for the Debtor (hereinafter "Receiver"). The Receiver was to: (i) take control of all of the Debtor's assets, books and records; (ii) use the funds collected to preserve the assets and properties held in the names of the Debtor and its affiliates; (iii) investigate whether assets had been impermissibly transferred or disposed of; and (iv) investigate the disposition of the Debtor's funds derived from unlawful sales of securities.

On September 26, 2005, the District Court entered an Order granting preliminary injunction (hereinafter "PIO") with the consent of the Debtor and Mr. Puff, continuing the restraints and the receivership set forth in the TRO. On October 5, 2005, that Court entered an Amended Order modifying the PIO (hereinafter "Amended PIO"), which authorized the Receiver to: (i) implement a sales procedure for the real properties owned by the Debtor, its affiliates, or investors; (ii) institute an equitable process for resolution of investors' claims and competing interests in the properties; and (iii) commence proceedings to recover unlawful transfers from the Debtor to third parties.

In addition, the Amended PIO imposed protections enjoining third parties from foreclosing on properties titled in the investors' names or suing investors to collect on debts arising from transactions involving the Debtor, Wayne Puff, or their affiliated entities. The Amended PIO also imposed similar restraints preventing suit against the Debtor, Mr. Puff, their affiliated entities, and Mr. Puff's relatives, including Kyu Nam Park, Gary Puff, and Bruce Puff.

4

On October 31, 2005, the Receiver filed his preliminary report with the District Court.  In response, the District Court entered an Order authorizing the Receiver to file a bankruptcy petition on behalf of the Debtor.  On November 22, 2005, the Receiver filed the instant voluntary petition for relief under Chapter 7 of the Bankruptcy Code on behalf of the Debtor in the United States Bankruptcy Court for the District of New Jersey, Case No. 05-60442.

On November 23, 2005, the Trustee was appointed.  After withdrawing the reference of this proceeding, The Honorable Jose L. Linares entered an Order on December 5, 2005 providing that "the TRO, the PIO and the Amended PIO shall continue in full force and effect in the Debtor's bankruptcy case," authorizing the Trustee to implement a process for the sale of properties titled in the Debtor's name, and again referring the bankruptcy proceeding to this Court.

On or about January 12, 2006, the Trustee moved before this Court for an Order authorizing his retention of the Joint Venture to sell approximately four hundred (400) real properties, titled in the Debtor's name and in the names of investors, free and clear of liens, and to borrow up to $500,000 from the Joint Venture to fund the sale in exchange for first priority liens pursuant to Sections 105 and 364 of the Bankruptcy Code ("First Sale Motion").  After conducting three hearings on this Motion, this Court entered an Order on April 17, 2006 granting it in part (hereinafter "First Sale Order").  Pursuant to the First Sale Order, the Trustee was authorized to sell approximately one hundred and fifty (150) properties titled solely in the Debtor's name.  On the same date, this Court, after notice and hearing, entered: (i) an Order authorizing retention of the Joint Venture to market and sell the properties in accordance with the First Sale Order and the conditions of the joint venture agreement (hereinafter "Retention Order"); and (ii) an Order modifying and granting the Trustee's requested financing by providing the Joint Venture with

5

superpriority liens on the properties of $500,000 covered by the First Sale Order (hereinafter "Financing Order").

On June 29, 2006, this Court granted in part the Trustee's First Sale Motion by authorizing relief similar to that provided in the First Sale Order, Retention Order and Financing Order, with first priority priming liens only as to properties titled in the names of investors in which the Lenders asserted mortgage interests (hereinafter "Second Sale Order").  On July 19, 2006, the Court entered an Order authorizing the Trustee to conduct an auction sale of additional properties (hereinafter "Supplemental Financing Order").   By Order dated August 10, 2006, this Court entered a supplemental Order authorizing secured post-petition financing from the Joint Venture on a superpriority basis extending those liens to all properties covered by the Second Sale Order (hereinafter "Supplemental Financing Order").   The Lenders and others filed appeals from the Second Sale Order and the Supplemental Financing Order to the United States District Court.  On September 25, 2006, Judge Linares entered an Order staying the Trustee's sale of certain properties, including most of the Second Sale Properties.

On September 29, 2006, September 30, 2006, and October 1, 2006, the Joint Venture conducted an auction of properties authorized by the First Sale Order, as well as certain properties authorized by the Second Sale Order.  Since issuance of the stay on appeal, the Debtor, Trustee, and Lenders have negotiated and mediated the issues on appeal.  The result of that mediation is the Settlement now before this Court.

**Terms of Settlement**

The following is a general summary of the proposed settlement agreements between the

Trustee and Lenders, relating to properties defined in Exhibits A and B to the motion.[1]

1.    The Trustee shall be authorized to sell the remaining properties pursuant to the Second Sale Order at an auction to be conducted by the Joint Venture, in which Lenders will be permitted to credit bid.

2.    Each Lender shall pay to the Debtor's estate the sum of $20,000 for each property sold that is also the subject of the Second Sale Order, and in certain cases, for properties otherwise disposed of or abandoned.

3.    The Trustee shall have the duty to resolve prior recorded liens on certain Second Sale properties before or by the proposed auction date. In the event the Trustee does not obtain such resolution, each Lender has the option of obtaining a dismissal of adversary proceedings related to each in exchange for the payment of $20,000 to the Debtor's estate, for which the Trustee agrees to abandon the subject property.

4.    The Trustee and each Lender shall release their respective claims against the other.[2]

5.    The Trustee and each Lender shall resolve and determine the Lender's mortgage claims with respect to properties governed by the Second Sale Order and relating to unsecured claims against the Debtor's estate, as well as authorize payment on mortgage claims to the extent of the net proceeds of sale on the Second Sale Order properties.

6.    Investors indebted to the Lenders on account of mortgages on Second Sale Order properties will be offered releases of the Lender's deficiency claims as well as the Trustee's claims in the event they provide mutual releases and forego their interests in the Second Sale properties.

---

[1] Neither the settlements nor the sale would impact properties other than those identified on Exhibits A and B to the motion.

[2] Under the proposed settlement with Washington Mutual Bank, the releases will be limited to the properties and related mortgage transactions identified in Exhibit D to the motion.

7.      The Lenders shall not pursue competing claims against certain individuals and entities against whom the Trustee has already or will file adversary complaints.[3]

If approved, the Settlement would resolve claims among and between the Trustee and Lenders in one hundred thirty-four (134) adversary proceedings.  In addition, the Settlement will provide substantial consideration to Debtor's estate.  Further, the Settlement provides a mechanism to resolve claims through an exchange of mutual releases between the Trustee, Lenders, and individual investor defendants provided the investors seek to release Lenders in consideration for being released from potential deficiency claims owed to the same Lenders.  Finally, the Settlement would result in dismissal of the Lenders' appeals pending in the District Court.

**Sale of the Properties**

The Settlement provides for the Trustee to sell properties subject to the Second Sale Order ("Second Sale Properties") with the Lenders withdrawing their objections as to the properties being sold.  In addition, as to the sale of the Second Sale Properties, the Lenders would withdraw all pending appeals and be required to seek dissolution of the stay imposed by the District Court.  Upon dissolution of the stay, there will exist no impediment to selling the Second Sale Properties.

No party appealed the First Sale Order and the auction sale was completed.  However, for reasons unknown to the Court, certain successful bidders at the auction sale refused to close on the First Sale properties and are identified in Exhibit B to the motion.  The Trustee seeks authorization

---

[3] However, Washington Mutual Bank will be permitted to continue existing arbitrations and commence litigation against First United Mortgage Corporation.  In addition, Washington Mutual Bank's agreement to forego claims against third parties other than First United Mortgage Corporation is limited to claims arising from properties and mortgage transactions identified in the proposed settlement agreement with the Trustee.

for resale of those properties together with the Second Sale Properties.  The requested authorization of sale would not affect any claims that the Debtor's estate or the Trustee hold against those successful bidders for damages suffered on a theory of breach of contract.

Net proceeds of the auction sale are to be distributed as follows.  The Lenders shall be paid from the net sale proceeds free and clear of liens and claims, and shall thereupon be deemed satisfied subject to certain conditions.  All junior priority liens of record shall attach in full to the net proceeds, if any, subsequent to the Lender's payment.  Any valid senior interest of record or judgment shall be paid first, unless the Lender obtains a stay or judicial invalidation of the judgment or lien.  Upon challenge, the Trustee shall hold the proceeds in an interest-bearing account pending final determination of lien priority and disbursement.

**Joint Venture Motion**

If the Settlement and sale motion is granted, the Trustee would again require the services of the Joint Venture for the marketing and sale of the Second Sale Order Properties as well as for the resale of the First Sale Order properties.  For these purposes, an amended joint venture agreement has been negotiated by and among the Trustee and the Joint Venture ("Amended Agreement").  The Amended Agreement would supersede the terms of the agreement approved in this Court's Retention Order.  Pursuant to the Amended Agreement and consistent with the terms of the agreement subject to the Retention Order, the Joint Venture shall:

1. Prepare marketing materials and an information packet for interested bidders.
2. Implement an advertising campaign over a four to five week span focusing on the specific attributes of each property.

3.            Conduct a large direct mailing program including thousands of investors based upon interest in past auctions run by the Joint Venture entities.

4.            Notify local brokerages and offer registered prospects for the auction.

5.            Offer site inspections.

6.            Conduct seminars to answer any buyer questions.

The Trustee estimates an auction date in early November 2007.  In support of the marketing program, the Trustee points to the results generated by the Joint Venture during the first auction where, as a result of the marketing efforts, over 800 persons attended bidding seminars and over 850 prospects purchased bidders' packages, a requirement for bidding.  Three well attended auction days took place with robust bidding at the auction.  Total sales for the three-day auction were $22,733,700, inclusive of a buyer's premium.  *See* Cert. of Jeffrey Hubbard, Partner and Executive Managing Dir. of Sheldon Good & Company Auctions NorthEast, LLC in Supp. of Confirmation of the First Auction dated October 3, 2006.

Under the Amended Agreement, the Joint Venture shall receive a ten percent (10%) buyer's premium on the highest cash offer accepted by the Trustee, which shall be added to the bid amount to determine the total purchase price.  However, the Amended Agreement limits compensation to the Joint Venture in the event the highest offer accepted is in the form of a credit bid.  In this instance, the Trustee is responsible to pay the buyer's premium in the event of sale to an institutional credit bidder.  In light of this burden, the Trustee negotiated a reduced buyer's premium on a sliding scale of $5,000 to $0 per property, dependent upon the number of properties sold.

The Joint Venture is to be reimbursed for out-of-pocket expenses.  The loan provided to fund the auction expenses will not exceed $500,000 and will not bear interest.  In return, the Trustee is to provide collateral for the loan.  Under the Settlement, each Lender has agreed to provide the

Debtor's estate $20,000 for each Second Sale Property sold, or an estimated total of $2,680,000 if all one hundred thirty-four (134) properties are sold. As collateral, the Joint Venture has agreed to accept a first priority lien on the unencumbered settlement payments.

**Legal Arguments**

In support of approval of the Settlement, the Trustee notes that the Settlement would provide a large influx of cash to the Debtor's estate and would permit the Trustee, Lenders, and individual defendants to resolve numerous, complex, and novel legal claims couched in one hundred thirty-four (134) adversary complaints. In further support of his Joint Venture motion, the Trustee points to the success of the previous auction, an enhanced auction structure, and the fact that the collateral requested by the Joint Venture is unencumbered.

Objections filed with respect to the Settlement and sale motion are summarized as follows. First, it is argued that the proposed sale is improper for the same reasons previously articulated in the initial objections to the Trustee's First Sale Motion. Second, the Settlement fails to account for the needs of defrauded individual investors. Specifically, the objectors point to the fact that only "reasonable efforts" to offer full release and discharge of claimed indebtedness is required by the Lenders, and that the individual investors would be required to forego their rights to the subject properties in order to achieve a release. Third, the Settlement was negotiated piecemeal and primarily with the Lenders and did not include the individual investors at any stage of the negotiation or mediation.

Certain defendants object to the Joint Venture motion. First, they argue the terms of the Joint Venture retention are contrary to the Local Bankruptcy Rules. Second, payment of the Joint Venture

should be pursuant to a fee application as opposed to direct payment after closing. Third, the "buyer's premium" provided for by the Proposed Retention Order should constitute proceeds of the sale and, therefore, should be property of the estate. Fourth, the proposed retention of an auctioneer is not in the best interests of the creditors because real estate brokers require a lower commission and their listing of the properties might result in a higher sale price. Fifth, the post-petition financing using borrowed funds from the Joint Venture to pay their expenses is not in the best interests of the creditors and the estate.

In response, the Trustee clarifies that this Joint Venture motion only seeks a continuance of the existing retention of the Joint Venture, which was not challenged on appeal. At the time the Joint Venture was initially retained, there was no objection by defendants who now take contrary positions. In addition, the Trustee notes that proceeds from the first auction were held and deposited by the Trustee, not the Joint Venture, and a similar practice would be used during the second auction. Further, the payment of the "buyer's premium" and the proposed loan to the Joint Venture are in accordance with the initial terms approved by the Court on April 17, 2006.

### Discussion

As representative of the bankruptcy estate, a trustee maintains a fiduciary relationship with estate creditors. *Myers v. Martin (In re Martin)*, 91 F.3d 389, 394 (3d Cir. 1996) (citing *Commodity Futures Trading Comm. v. Weintraub*, 471 U.S. 343, 354-55 (1985)). It is the trustee's duty to investigate the assets as well as sources of income to the estate and "collect and reduce to money the property of the estate. . . ." 11 U.S.C. § 704(a)(1) (2007). In so doing, the trustee is "bound to

be vigilant and attentive in advancing [the estate's] interests." *In re Martin*, 91 F.3d at 394 (citation omitted).

Federal Rule of Bankruptcy Procedure 9019 governs compromises to which a trustee in bankruptcy is a party. A bankruptcy court may approve a compromise or settlement on motion of a trustee after notice and hearing as provided in Federal Rule of Bankruptcy Procedure 2002. FED. R. BANKR. P. 9019(a). A trustee bears the burden to show that a proposed settlement is in the best interests of the estate and the debtor. *In re Neshaminy Office Bldg. Assocs.*, 62 B.R. 798, 804 (E.D. Pa. 1986) ("[T]o meet its burden the trustee must establish that the proposed compromise is in the best interests of the estate.") In assessing the best interest to the debtor, the Court must look to the consideration for settlement. *Id.* This analysis pits the value of rights relinquished by the debtor versus the value received in return. *Id.* In determining whether to approve a proposed settlement, a court is permitted to "'take judicial notice of the record in prior related proceedings, and draw reasonable inferences therefrom.'" *Id.* at 802 (citation omitted); *see* FED. R. EVID. 201.

Approval of a compromise under Rule 9019 is within the sound discretion of the bankruptcy court. *In re Martin*, 91 F.3d at 393; *In re Neshaminy Office Bldg. Assocs.*, 62 B.R. at 803. "To minimize litigation and expedite the administration of a bankruptcy estate 'compromises are favored in bankruptcy.'" *In re Martin*, 91 F.3d at 393 (citing 9 COLLIER ON BANKRUPTCY ¶ 9019.03[1] (15th ed. rev. 1993)). A Court must carefully examine a proposed settlement in considering whether to approve it. *Will v. Northwestern Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006) (citing *see In re Martin*, 91 F.3d at 393 (other citation omitted)). In determining whether to approve a settlement, the court must analyze:

13

> (1) the probability of success in litigation; (2) the likely difficulties
> in collection; (3) the complexity of the litigation involved, and the
> expense, inconvenience and delay necessarily attending it; and (4) the
> paramount interest of the creditors.

*In re Martin*, 91 F.3d at 393 (citing *In re Neshaminy Office Bldg. Assocs.*, 62 B.R. at 803); *see In re Nutraquest, Inc.*, 434 F.3d at 644 (quoting *In re Martin*, 91 F.3d at 393).

Furthermore, the Third Circuit has found:

> In determining whether to approve the trustee's application to settle
> a controversy, the Bankruptcy Court does not substitute its judgment
> for that of the trustee.  'Nor is the court 'to decide the numerous
> questions of law and fact raised by [objections] but rather to canvass
> the issues to see whether the settlement fall[s] below the lowest point
> in the range of reasonableness."

*In re Neshaminy Office Bldg. Assocs.*, 62 B.R. at 803 (citations omitted).  Stated otherwise, it is not a court's role to substitute its own discretionary judgment for that of a trustee.

"It is axiomatic that settlement will almost always reduce the complexity and inconvenience of litigation."  *In re Nutraquest, Inc.*, 434 F.3d at 646 (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 434 (1968) (superseded by statute on other grounds) ("Litigation and delay are always the alternative to settlement, and whether that alternative is worth pursuing necessarily depends upon a reasoned judgment as to the probable outcome of litigation.")).  Balancing the complexity and delay of litigation with the benefits of settlement is part in parcel of the probability-of-success-in-litigation factor. *In re Nutraquest, Inc.*, 434 F.3d at 646 (citation omitted).

Here, the objectors reargue the positions taken in initially opposing the Trustee's original sale motion.  However, the doctrine of *res judicata* is fully applicable to decisions made by a bankruptcy court.  *Fox v. Congress Fin. Corp. (In re Target Indus.)*, 328 B.R. 99, 115 (Bankr. D.N.J.

14

2005) (citing *Katchen v. Landy*, 382 U.S. 323, 334 (1966) (decided under the Bankruptcy Act)).

"Moreover, *res judicata* is applicable to final orders issued by the bankruptcy court." *In re Target Indus.*, 328 B.R. at 115 (citing *NovaCare Holdings, Inc. v. Mariner Post-Acute Network, Inc. (In re Mariner Post-Acute Network, Inc.)*, 267 B.R. 46, 52-53 (Bankr. D. Del. 2001). *Res judicata* "provides that 'a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'" *In re Target Indus.*, 328 B.R. at 115 (quoting *Allen v. McCurry*, 449 U.S. 90, 93 (1980)).

It is clear an order approving sale pursuant to Section 363 is a final order for purposes of *res judicata*. *Gazes v. Delprete (In re Clinton St. Food Corp.)*, 254 B.R. 523, 530 (Bankr. S.D.N.Y. 2000); *see Bank of Lafayette v. Baudoin (In re Baudoin)*, 981 F.2d 736, 742 (5th Cir. 1993) (citation omitted) (bankruptcy court orders "authorizing the sale of part of the estate or confirming such sale are final judgments on the merits for *res judicata* purposes, 'even though the order neither closes the bankruptcy case nor disposes of any claim'"); *In re Botany Indus., Inc.*, 17 B.R. 631, 633 (Bankr. E.D. Pa. 1982). In addition, because a sale of assets constitutes an *in rem* proceeding, it is "good against the world, not just the parties to a judgment or persons with notice of the proceeding." *Gekas v. Pipin (In re Met-L-Wood Corp.)*, 861 F.2d 1012, 1017 (7th Cir. 1988). Indeed, under the dictate of public policy, sale orders entered pursuant to Section 363 are provided heightened finality to prevent the exact chaos the objectors seek to manufacture, namely "the chance the purchasers will be dragged into endless rounds of litigation to determine who has what rights in the [purchased] property." *In re Sax*, 796 F.2d 994, 998 (7th Cir. 1986); *accord In re Clinton St. Food Corp.*, 254 B.R. at 530 (citations omitted) (noting "the important public policy favoring the finality of orders transferring ownership of bankruptcy estate assets").

15

Here, it cannot be argued that the doctrine of *res judicata* is inapplicable. This Court's previous Sale Orders constitute final judgments upon the merits. Indeed, the same parties are involved. In addition, the argument *sub judice* comes subsequent to the Sale Orders and is based upon the identical arguments and claims. This Court therefore will not consider objections grounded in arguments previously made in opposition to the underlying sale motion as they are barred by the doctrine of *res judicata*.[4]

The issue before the court is the reasonableness of the Settlement considering the probability of success, the complexity of the litigation, the cost and delay occasioned by the complex litigation, and the interest of creditors. The outcome of multiple litigations is always uncertain. The adversary proceedings at issue are complex in nature and would require lengthy trials on difficult issues of law. Those familiar with the Trustee's proceeding are intimately aware of this fact, which is evident by a review of the docket, especially the voluminous consolidated motions to dismiss filed as to the Trustee's adversary complaints. Looking at a microcosm of the Trustee's adversary complaints, the parties involved in these one hundred thirty-four (134) adversary proceedings have been extremely litigious to date. Indeed, as evidence of the complexity, one needs only to observe the parties have been in negotiations for over eighteen months and in mediation for six months. The expense in litigating these matters has been enormous and the delay caused by their complexity is long, with

---

[4] The objections are equally barred by the law of the case doctrine, as no litigant has provided a persuasive argument for this Court to utilize its discretion in favor of non-applicability.

> The law of the case doctrine provides that when a court actually decides a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. However, that doctrine only applies to issues that were actually litigated and decided by the court.

*Philip Servs. Corp. v. Luntz (In re Philip Servs.)*, 267 B.R. 62, 66 (Bankr. D. Del. 2001) (citing *AL Tech Specialty Steel Corp. v. Allegheny Int'l Credit Corp.*, 104 F.3d 601, 605 (3d Cir. 1997)) (other citations omitted).

16

no real end in sight.  All of the above are without the benefit of cross-claims, counter-claims and third party claims against, *inter alios*, the Debtor and Wayne Puff, which are currently stayed. Certain investors argue the easy answer or an alternative to the litigation is abandonment.  However, abandonment would come at the loss of at least $2,680,000 in benefit to the estate.  Abandonment benefits none of the parties.

While a limited number of Second Sale Properties involve priority disputes, the proposed Settlement preserves all parties' rights in these disputes.  Therefore, the Settlement neither affects nor prejudices the rights of competing mortgage holders.  In addition, the Trustee has successfully brokered the opportunity to resolve and release claims by and among himself, the Lenders, and individual investors.  This concept has always been sensitive and crucial to the Court as it is the Lenders that have driven the litigation thus far.  In comparison, few of the hundreds of individual investors joined in the Trustee's numerous complaints have appeared and even less have attempted to defend the relief sought by the Trustee.  This Court has always expressed concern throughout this proceeding, evidenced by the record in numerous hearings in this matter, for the *pro se* individual investors.  It is undisputed that the individuals are deeply afflicted by the Debtor's fraud, many of whom lost their life savings and simply seek finality to this chapter in their life.  Such is reflected by the countless letters received and docketed by the Court reflecting investors' concerns.  It is evident to this Court that the Trustee has made substantial effort to provide a release option to individual defendants.  In addition, the Settlement does not seek to disturb the priority of lienholder interests, opting to pay lienholders in order of priority.  Finally, the Settlement seeks to infuse approximately $2,680,000 into the bankruptcy estate for the benefit of creditors.  As the individual

investors and lienholders are inevitably creditors of the Debtor's estate, it cannot be said that the Settlement does not account for the paramount interest of creditors.

The Settlement is designed to minimize claims against the Estate through the exchange of mutual releases between the Trustee, Lenders, and individual investors.  This has the effect of eliminating claims against the investors for any deficiency on their mortgage notes which, in turn, will eliminate claims by the investors against the Estate for the Debtor's alleged fraud.  The end result is noteworthy – elimination of lengthy, complex, and expensive litigation for all concerned, with investors gaining a deficiency release, the primary goal at this point of most investors who recognize their investment is worthless but fear being chased by Lenders for additional funds.

Significantly, and this is important, the investors may elect to continue to litigate with the Trustee if they desire by simply not agreeing to exchange releases.  They have an absolute option which the investors control.  Thus, the Settlement affords investors wide latitude and this mitigates against the objection of a few investors that they were not involved in the mediation and drafting of the Settlement.  It is clear the Settlement crafted by the parties and the Mediator protects and benefits the individual investor while granting an option to allow them to continue litigation if they so elect.

Clearly, these Settlements are beneficial to the Debtor.  In spite of the Debtor's alleged rampant fraud, the Trustee has been able to resolve the claims of the largest creditors of the bankruptcy estate, this prior to an extraordinary number of counter-claims and third-party claims against the Debtor if the filing stay imposed by the District Court was lifted.  Simply put, the benefit to the Debtor is one of elimination of potential legal liability and exposure to substantial legal expense. The benefit to the estate is equally clear.  The proposed Settlement will provide a sizeable

18

infusion to the estate and the elimination or reduction of claims to be filed against the Estate. This is a benefit to all creditors and gives finality to all concerned.

A concern expressed by a few objectors is releasing their property interests in exchange for settlement. However, the Settlement provides that valid lienholders' interests will attach to the proceeds of sale in the same priority and to the same extent. In addition, while unsecured defendants may not wish to lose their property interest, nothing compels them to accept the release offered. Indeed, they are free to negotiate and litigate if they so elect.

For the above reasons, it is clear that the proposed Settlement is: (i) a reasonable exercise of the Trustee's business judgment, (ii) well above the lowest point in the range of reasonableness, and (iii) in the best interests of the Debtor and the bankruptcy estate. The Settlement is therefore approved. This Court has already determined that the properties at issue are subject to sale by the Trustee and will not revisit the issue.[5] The sale is, of course, conditioned upon the Lenders achieving a dissolution of the stay imposed by the District Court.

The Trustee's companion Joint Venture motion is made necessary by the approved Settlement. Specifically, he requests that the Court: (i) permit the continued retention of the Joint Venture; (ii) authorize up to $500,000 in post-petition financing by the Joint Venture secured by unencumbered property of the estate in order to fund necessary marketing and conduct of the auction sale; and (iii) grant the Joint Venture the protections of Section 363(n) and 364(e) of the Bankruptcy Code.

---

[5] The Trustee seeks to preclude successful bidders at the first auction, who failed to close upon properties purchased therein, from bidding at the subsequent auction sale. However, no explanation for the failures is provided, including whether the failure was the result of actions taken by the Trustee or the Debtor. As such, this request is denied.

19

As applicable here, "the trustee, with the court's approval, may employ one or more . . . auctioneers . . . that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title." 11 U.S.C. § 327(a).

>The term 'disinterested person' means a person that --
>
>(A)    is not a creditor, an equity security holder, or an insider;
>
>(B)    is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and
>
>(C)    does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

11 U.S.C. § 101(14). "The trustee . . . , with the court's approval, may employ or authorize the employment of a professional person under section 327 . . . of this title . . . on any reasonable terms and conditions of employment, including . . . on a fixed or percentage fee basis, or on a contingent fee basis." 11 U.S.C. § 328(a).

The Trustee represents to the Court that the entities comprising the Joint Venture continue to constitute "disinterested persons" as that term is defined in Section 101(14). As required by the Court at the time of oral argument, new Affidavits of Disinterestedness have been filed by the Joint Venture. Relying upon these Affidavits and incorporating the original pleadings of disinterestedness in support of the application for retention, as well as the testimony heard during the hearings concerning retention of the Joint Venture, this Court approves the continued retention.

20

"If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title . . . the court . . . may authorize the obtaining of credit or the incurring of debt -- . . . secured by a lien on property of the estate that is not otherwise subject to a lien. . . ."  11 U.S.C. § 364(c)(2). Here, the Trustee is unable to obtain unsecured credit as an administrative expense.  The proposed collateral for the financing will be the Lender payments of approximately $2,680,000.  This collateral, upon payment, may be used to secure the post-petition borrowing by the Trustee.

Lastly, the Trustee requests that the Joint Venture be entitled the protections of Sections 363(n) and 364(e) of the Bankruptcy Code.  No evidence exists before the Court that the Joint Venture constitutes anything other than a good faith lender.  In addition, the Trustee seeks to release his claim for recovery of fees and expenses from the Joint Venture in the event of avoidance of any sale of property.  Presumably, such an agreement was in consideration for the Joint Venture financing and is not strongly opposed.  As such the Trustee's request is granted.

## Conclusion

For all of the aforementioned reasons, the Trustee's motions are granted with the single exception that bidders at the first auction allegedly in breach for failure to close upon their purchase shall not be precluded from bidding at the auction sale authorized herein.

An Order in conformance with this Opinion has been entered by the Court and a copy is attached hereto.

/s/ *Donald H. Steckroth*

_____
DONALD H. STECKROTH
UNITED STATES BANKRUPTCY JUDGE

Dated: September 13, 2007

21